1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| IN THE MATTER OF THE EXTRADITION OF SAMIR AZIZI | Case No.  5:14-xr-90282 PSG |
| --- | --- |
| | **ORDER GRANTING MOTION FOR CERTIFICATE OF EXTRADITABILITY** |
| | [Re:   Dkt. 49, 57] |

The United States, on behalf of the Federal Republic of Germany (Germany), seeks the extradition of Samir Azizi.  Azizi is charged in Germany with 89 counts of tax evasion---i.e., 77 counts of providing tax authorities with incomplete or incorrect statements about tax-relevant facts and 12 counts of failing to inform them about tax-relevant facts, acting contrary to duty---in violation of Section 370, subsection no. 1 and no. 2, subsection 3 sentence 2 no. 1 and no. 5 of the Fiscal Code of Germany in connection with Sections 18 of the Turnover Tax Act of Germany, 22, 23, 25 subsection 2, 53 of the Penal Code of Germany, and Sections 1, 105 ff of the Juvenile Justice Act of Germany.  According to the German government, between April 30, 2008 and April 10, 2012, Azizi evaded €61,104,368.00 in value added taxes (VAT).  As will be discussed more fully below, the authorities contend that Azizi, acting as de facto managing director of eleven

United States District Court
Northern District of California

1  different companies,[1] was obliged to file tax returns pursuant to Sections 34, 35, 149, and 150 of

2  the Fiscal Code.  But, they allege that Azizi failed to file tax returns, fraudulently claimed refunds

3  of VAT, and evaded payment of VAT.  The charges are based on allegations of gang-based tax

4  evasion via so-called "Missing Trader Intra-Community" fraud, also known as "carousel" fraud.

5      The government's extradition request is made pursuant to the extradition treaty (and

6  supplementary treaties) in full force and effect between the United States and Germany.[2]  For the

7  reasons discussed below, the government's motion for a certificate of extraditability is granted.[3]

# BACKGROUND

9  **A.  Events Leading to Azizi's Arrest**

10      According to the Request for Extradition (RFE), the investigation of Azizi and others

11  began with a December 10, 2007 report of suspected money laundering, made by the Cologne

12  District Savings Bank to the North Rhineland-Westphalia Regional Criminal Police Office.  This

13  court is told that the report concerned Azizi's sister, Hosai Azizi, who was the official managing

14  director of WOC GmbH (WOC), the company allegedly involved in the suspected laundering.

15  The government says that money laundering was suspected because (1) sales of approximately

16  €1.7 million were made after the account opened in May 2007; (2) most of the cash sales were for

17  cell phones; and (3) some payment transactions having been executed in a different country, there

---

18

19  [1] The identified companies are:  (1) WOC GmbH; (2) Ferrograph GmbH; (3) Wega Mobile
20  GmbH; (4) iTrading GmbH & Co. KG; (5) iCell GmbH & Co. KG; (6) AS Handel GmbH;
    (7) Nexo Chakfa GmbH; (8) Hamsterecke.de GmbH/Hamster Mobile GmbH); (9) Amaan
    Enterprise GmbH/Mobiltronics GmbH; (10) BAK Enterprises GmbH; and (11) My iCell GmbH.

21
22  [2] The relevant treaties are the Treaty Between the United States of America and the Federal
    Republic of Germany Concerning Extradition, signed on June 20, 1978 (1978 Treaty); the
23  Supplementary Treaty to the Treaty Between the United States of America and the Federal
    Republic of Germany Concerning Extradition, entered into force on March 11, 1993 (1993
24  Supplementary Treaty); and the Second Supplementary Treaty to the Treaty Between the United
    States of America and the Federal Republic of Germany Concerning Extradition, signed on April
    18, 2006 (2006 Second Supplementary Treaty).  (See Dkt. 18, Ex. A).

25
26  [3] At the extradition hearing, the government requested that Germany's formal Request for
    Extradition, as well as all supplemental pleadings of the government, including the Report of
27  Investigation prepared by Deputy United States Marshal Christopher Hulse (Dkt. 37) be moved
    into evidence.  Azizi stated that he had no objection, and the government's motion was granted.

28                                              2

United States District Court
Northern District of California

1   were indications that WOC was involved in a carousel fraud.  (RFE 12).  Investigation of WOC

2   and Hosai Azizi led to Samir Azizi.

3           Authorities say that they obtained court orders and searched WOC's business premises and

4   Azizi's homes.  After review of the documentary evidence seized in those searches, the

5   government says it found other indicators of carousel fraud.  For example, according to the RFE,

6   in some instances WOC did submit VAT returns for intra-Community purchases (i.e., transactions

7   between different members of the European Union (EU)).  But, the government says that amounts

8   for purchases reported in October 2008 to December 2008 (€2,999,271.00) differed significantly

9   from amounts reported by the supplier for the fourth quarter of 2008 (€1,546,765.00) through the

10  VAT information exchange system known by the acronym MIAS

11  (Mehrwertsteuerinformationsaustauschsystem).  Most notably, says the government, a comparison

12  of the purchase and sale prices for individual cell phones revealed that the net purchasing prices

13  were higher than the net selling prices.  In other words, the cell phones were resold below their

14  cost.  According to the government, that is an indicator that a profit margin could only be realized

15  from unlawfully undeclared and unpaid VAT.  (RFE 12-13).

16          In the course of their searches, authorities say that they determined that he and most of his

17  family members had already applied for new passports, left the premises, and were in the process

18  of leaving Germany.  (RFE 13).  On May 12, 2010, authorities obtained warrants for the arrest of

19  Samir and Hosai Azizi for tax-related crimes concerning WOC.  Hosai Azizi was arrested.  Samir

20  Azizi, however, became a fugitive and was placed on the wanted list.  (Id.).

21          Azizi nevertheless remained in contact with the investigating authorities through his

22  defense attorney.  And, the government says that he initially appeared to be cooperating in the

23  investigation, possibly to benefit from a mitigation of punishment.  (RFE 15).  During the course

24  of the government's investigation, Azizi was interviewed, and he made statements to the

25  authorities.[4]  According to the government, Azizi subsequently broke contact with his solicitor and

26

27  ────────────────
    [4] Anne Brorhilker, the German prosecutor, avers that Azizi's statements were made through his
    defense attorney by phone or in writing using Skype on his attorney's computer; and, with Azizi's

28                                              3

1    fled.  (RFE 93).

2        On January 9, 2014, the Local Court in Cologne issued a warrant for Azizi's arrest; and,

3    through diplomatic channels, Germany asked the United States for the provisional arrest of Azizi

4    with a view toward his extradition.  On March 31, 2014, the United States, on Germany's behalf,

5    filed in this district a Complaint for Provisional Arrest with a View Toward Extradition.  Later that

6    same day, a magistrate judge of this district issued a provisional arrest warrant, and United States

7    marshals arrested Azizi at the San Francisco International Airport after he disembarked a flight

8    from Dubai.

9        At his preliminary appearance on April 1, 2014, this court ordered that Azizi be held

10   without bond.  Over the next several months, Azizi filed a motion to be released on bail, as well as

11   a motion and supplemental motion to terminate his provisional arrest---all of which were denied.[5]

12   In the meantime, Germany submitted its formal Request for Extradition and supporting

13   documentation to the court.

14       The court subsequently set a briefing and hearing schedule, prepared with the input of both

15   sides and without objection as to the designated deadlines.  That schedule included a November

16   14, 2014 filing deadline for Azizi's extradition brief and a November 21, 2014 extradition hearing.

17       **B.  Azizi's Request for a Continuance**

18       Azizi never filed his brief.  Instead, late on the day his brief was due,[6] he requested a

_____

20   consent, a report of his written statements was issued and made available to the investigating
21   officer, Birgit Orths.  (RFE 14-15).  His statements are referenced throughout the RFE and are
     discussed more fully below.

22   [5] Azizi filed a petition for writ of habeas corpus with respect to the denial of his motions to
23   terminate his provisional arrest.  See *Azizi v. O'Keefe*, Case No. 3:14-cv-04468-HSG.  That matter
     remains pending.

24   [6] Azizi, who is represented by several attorneys both in the United States and abroad, did not
25   satisfactorily explain why he waited until the filing deadline to request an extension of time.
     Counsel stated that there was a delay in obtaining information that Azizi's German lawyer hoped
26   to obtain from the German prosecutor in the criminal proceedings pending there.  Even so, counsel
     acknowledged that, weeks before the November 14 filing deadline, they had notice that there may
27   have been a mishap or misunderstanding, or a failure to obtain that information.

28                                                    4

United States District Court
Northern District of California

United States District Court
Northern District of California

1  continuance of at least 60 days, stating that he needed more time to submit evidence "explaining"

2  the charges.  (Dkt. 49).  The court directed him to make an offer of proof.  He did so.[7]  The United

3  States opposed Azizi's requested continuance and objected to his proffer.  After having considered

4  the moving and responding papers, as well as the oral arguments presented, the court denied

5  Azizi's motion for a continuance on the record at the November 21, 2014 extradition hearing.

6  That ruling is memorialized here.

7  　　　　Azizi's right to produce evidence at an extradition hearing is limited.  In re Extradition of

8  Sindona, 450 F. Supp. 672, 685 (S.D.N.Y. 1978).  "While the formal rules of evidence do not

9  apply, the extradition judge's discretion must be exercised consistent with the distinction between

10  contradictory and explanatory evidence."  In re Extradition of Trinidad, 754 F. Supp.2d 1075,

11  1081 (N.D. Cal. 2010).  "Generally, evidence that explains away or completely obliterates

12  probable cause is the only evidence admissible at an extradition hearing, whereas evidence that

13  merely controverts the existence of probable cause, or raises a defense, is not admissible."

14  Barapind v. Enomoto, 400 F.3d 744, 749 (9th Cir. 2005) (quoting Mainero v. Gregg, 164 F.3d

15  1199, 1207 n.7 (9th Cir. 1999)); see also Trinidad, 754 F. Supp.2d at 1081 (same).  "Admission of

16  evidence proffered by the fugitive at an extradition proceeding is left to the sound discretion of the

17  court, guided of course by the principle that evidence of facts contradicting the demanding

18  country's proof or establishing a defense may properly be excluded."  Hooker v. Klein, 573 F.2d

19  1360, 1369 (9th Cir. 1978).

20  　　　　While courts recognize that the distinction between "contradictory" and "explanatory"

21  evidence is murky, the purpose behind the rule is clear:

22

23  　　　　　　　　In admitting "explanatory evidence," the intention is to afford an
　　　　　　　　accused person the opportunity to present reasonably clear-cut proof

24  　　　　　　　　which would be of limited scope and have some reasonable chance
　　　　　　　　of negating a showing of probable cause.  The scope of this evidence

25  　　　　　　　　is restricted to what is appropriate to an extradition hearing.  The

26  ────────────────────

27  [7] As will be discussed, at most, his offer of proof implicates only the 12 counts for the alleged
failure to file tax returns.

28  　　　　　　　　　　　　　　　　　　5

> decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits.

Sindona, 450 F. Supp. at 685; see also Koskotas v. Roche, 931 F.2d 169, 175 (1st Cir. 1991) (stating that "it is well established that extradition proceedings are not to be converted into a dress rehearsal trial.") (citation and quotations omitted).  Thus, attacks on credibility, evidence establishing a defense to the merits of the charges, and evidence that does not accept the requesting country's evidence as true are considered "contradictory," not "explanatory," evidence. This is so because "[i]t is well-established that an extradition magistrate 'does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense.'"  In re Extradition of Solis, 402 F. Supp.2d 1128, 1132 (C.D. Cal. 2005) (quoting Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir. 1986)).  The extradition proceeding "is designed only to trigger the start of criminal proceedings against an accused; guilt remains to be determined in the courts of the demanding country."  Valencia v. Limbs, 655 F.2d 195, 198 (9th Cir. 1981) (internal quotations and citations omitted).

Azizi identified three categories of evidence he wished to submit through an affidavit of his German lawyer---namely, evidence he says will prove that (1) he had no obligation to file the subject tax returns because he did not serve as director of the companies in question; (2) he had little or no connection to those companies; and (3) his conduct and activities did not trigger an obligation to file tax returns under any legal theory.  He requested additional time to review all of the discovery reportedly being produced by the German prosecutor in the criminal proceeding so that this court could make its probable cause determination based upon the "totality of the record." This court is unpersuaded that it must undertake that sort of review inasmuch as Germany is not required to produce all of its evidence at an extradition hearing.  See Quinn, 783 F.2d at 815.  In any event, it is apparent from Azizi's arguments that he wishes to submit evidence that merely controverts the existence of probable cause or establishes legal defenses to the substance of the charges.  His proffered evidence therefore is "contradictory," not "explanatory," within the

meaning of extradition law and is inadmissible here.

Azizi contends that he was not obliged to file the subject returns because he says German law provides that only directors are required to file returns; and, he claims he was not a director of any of the companies in question.  Germany holds a different view.  The government contends that Azizi acted as de facto managing director and that German caselaw provides that he must be recognized as the managing director.  (See, e.g., RFE 20-21).  And, according to prosecutor Brorhilker, Sections 34, 35, 149, and 150 of the German Fiscal Code provide the bases for Azizi's responsibility for filing returns.  (RFE 21).  Azizi wished to have his German lawyer tell this court that, in his opinion based upon the evidence, German law provides something different.  But, that is a defense, or at least a legal dispute as to whether someone like Azizi properly could be deemed a managing director under German law.  The proper interpretation of German law is not something which this court is equipped or authorized to address in this proceeding.

Azizi also wanted to have his German lawyer (1) tell this court that Azizi either was not involved (or was not sufficiently involved) to be responsible for filing the returns and (2) "explain" Azizi's conduct to show that nothing about his activities triggered an obligation to file returns.  As will be discussed, the government holds an entirely different view; and, the RFE goes into considerable detail about Azizi's alleged involvement in the questioned transactions.  Azizi's proffered evidence therefore raises significant fact issues and potential defenses and is not admissible here.

For these reasons, Azizi's request for a continuance was denied, and this court proceeded with the extradition hearing.  The court asked Azizi's counsel whether they wished to present any arguments as to the merits of the government's extradition request.  They said no.  The matter was then deemed submitted, and the United States subsequently filed a formal motion for certification and committal for extradition.

## LEGAL STANDARD RE EXTRADITION

Title 18 of the United States Code section 3184 governs extradition from the United States to a foreign country and authorizes "any justice or judge of the United States, or any magistrate

judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State" to conduct an extradition hearing under the pertinent treaty between the United States and the requesting nation and to issue a certification of extraditability to the Secretary of State.

The court's role in extradition proceedings is very limited, and "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir. 2006) (citations omitted); see also Blaxland v. Commonwealth Director of Public Prosecutions, 323 F.3d 1198, 1207 (9th Cir. 2003) (stating that extradition "is a diplomatic process carried out through the powers of the executive, not judicial, branch."). Where a person is brought before the court on an extradition complaint, a certification of extraditability properly is issued where:

> (1) the extradition judge is authorized to conduct the proceedings;
>
> (2) the court has jurisdiction over the fugitive;
>
> (3) the extradition treaty is in full force and effect;
>
> (4) the crimes for which surrender is requested are covered by the treaty; and
>
> (5) there is probable cause to believe that the fugitive committed the crime.

Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008) (citing Zanazanian v. United States, 729 F.2d 624, 625-26 (9th Cir. 1984)). If the court determines that all requirements have been met, the findings are incorporated into a certificate of extraditability, which is forwarded to the Secretary of State. 18 U.S.C. § 3184. The Secretary of State makes the ultimate decision whether to extradite the accused to the requesting country. Id., § 3186.

In carrying out its duties under § 3184, the extradition court liberally construes the pertinent treaty; and, "in the interest of justice and friendly international relationships," the treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." Factor v. Laubenheimer, 290 U.S. 276, 298, 54 S. Ct. 191, 78 L.Ed. 315 (1933). As explained by the Supreme Court:

> In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements.  Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intentions of the parties to secure equality and reciprocity between them.

Id. at 293.  Additionally, "[r]espect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."  El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 168, 119 S. Ct. 662, 142 L.Ed.2d 576 (1999) (citing Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85, 102 S. Ct. 2374, 72 L.Ed.2d 765 (1982)).

In extradition matters, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not apply.  Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3); Manta, 518 F.3d at 1146; Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1406 (9th Cir. 1988).  Rather, the admissibility of evidence is governed by the general extradition law of the United States and the provisions of the relevant treaty.  Emami v. U.S. Dist. Ct., 834 F.2d 1444, 1450 (9th Cir. 1987); Oen Yin-Choy, 858 F.2d at 1406.  And, "unless the relevant treaty provides otherwise, the only requirement for evidence is that it has been authenticated."  Manta, 518 F.3d at 1146; see also Emami, 834 F.2d at 1451 ("With regard to the admissibility of evidence, the general United States extradition law requires only that the evidence submitted be properly authenticated . . ..").

A certification of extradition properly may be based entirely on the authenticated documentary evidence and information provided by the requesting government, including reports and affidavits summarizing the evidence or witness statements.  See, e.g., Choe v. Torres, 525 F.3d 733, 739-40 (9th Cir. 2008) (noting that the magistrate judge properly considered the Korean prosecutor's summary of witnesses' testimony); Emami, 834 F.2d at 1450-52 (upholding extradition based on the German prosecutor's affidavit containing summaries of witness statements).

"The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate."  Quinn, 783 F.2d at 815.  Hearsay evidence is admissible.  Collins v. Loisel, 259 U.S. 309, 317, 42 S. Ct. 469, 66 L.Ed 956 (1922).  Moreover,

the self-incriminating statements of accomplices are sufficient to establish probable cause.

Zanazanian, 729 F.2d at 627-28.  As discussed above, "explanatory" evidence is admissible, but

"contradictory" evidence is not.  Barapind, 400 F.3d at 749; Hooker, 573 F.2d at 1369; Trinidad,

754 F. Supp.2d at 1081.  And, the accused is not permitted to turn an extradition proceeding into a

full trial on the merits.  Collins, 259 U.S. at 316.

# DISCUSSION

### A.  Authentication and the first four extradition requirements are satisfied

This court finds that all documents and evidence before it have been properly authenticated

and are therefore admissible.

18 U.S.C. § 3190 addresses the authentication of documents and provides:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

Certification under 18 U.S.C. § 3190, however, is not the only means by which documents may be

admitted in extradition proceedings.  Bovio v. United States, 989 F.2d 255, 260 (7th Cir. 1993);

see also generally Desmond v. Eggers, 18 F.2d 503, 505 (9th Cir. 1927).

Article 29 of the 1978 Treaty as amended by Article 6 of the Second Supplementary 2006

Treaty also addresses authentication and provides, in relevant part:  "Documents that bear the

certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign

affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested

State without further certification, authentication, or other legalization."  With respect to Germany,

the term "Ministry of Justice" means the Federal Ministry of Justice.  Id.

This court has received the formal extradition request from Germany bearing the seal of

the Federal Ministry of Justice.  Pursuant to the treaty, that is all that is required for authentication.

United States District Court
Northern District of California

10

United States District Court
Northern District of California

This court has also received supporting documents from the U.S. State Department.  These documents were submitted along with a certificate bearing the seal of the State Department and certifying that Elizabeth M. Kiingi is an Attorney-Adviser of the Office of the Legal Adviser of the State Department and that full faith and credit are due to her acts as such.  Appended to the certificate is Kiingi's declaration in which she, among other things, (1) attests that the formal extradition papers received from Germany bear the seal of the Ministry of Justice and require no further authentication; and (2) appends a copy of the diplomatic note from Germany requesting the extradition of Azizi, as well as a copy of the extradition treaty and supplementary treaties.

Additionally, as noted above, Germany's RFE, all supporting documents submitted by the State Department, and all supplemental pleadings of the government on file with the court, including the Report of Investigation prepared by Deputy United States Marshal Christopher Hulse (Dkt. 37) submitted through the declaration of Assistant U.S. Attorney John Glang, were formally admitted into evidence at the extradition hearing, without objection by Azizi.

Moreover, Germany has submitted all documents required by the treaty.[8]

---

[8] Article 14 of the 1978 Treaty lists the documents and information to be submitted with an extradition request:

(2) The request shall be accompanied by:

a)  All available information concerning the identity and nationality of the person sought;

b)  The text of all applicable provisions of law of the Requesting State concerning the definition of the offense, its punishment and the limitation of legal proceedings or the enforcement of penalties; and

c) A statement by a competent authority describing the measures taken, if any, that have interrupted the period of limitation under the law of the Requesting State.

(3) A request for the extradition of a person sought for the purpose of prosecution shall be accompanied, in addition to the documents provided for in paragraph (2), by:

a) A warrant of arrest issued by a judge of the Requesting State and such evidence as, according to the law of the Requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving that the person requested is the person to whom the warrant of arrest refers; and

b) A summary statement of the facts of the case unless they appear from the warrant of arrest.

1       Magistrate judges are authorized by 18 U.S.C. § 3184 to conduct extradition hearings, and

2   the local rules of this district expressly permit magistrate judges to conduct such proceedings.  See

3   Trinidad, 754 F. Supp.2d at 1079 (citing Crim. L.R. 7-1(b)(13));  see also Ward v. Rutherford, 921

4   F.2d 286, 287-89 (D.C. Cir. 1990) (concluding that a local rule authorizing magistrate judges to

5   conduct extradition hearings did not violate Article II of the U.S. Constitution).

6       This court has jurisdiction over Azizi because he is within its jurisdictional boundaries.  18

7   U.S.C. § 3184 (providing that the court "may, upon complaint made under oath, charging any

8   person found within his jurisdiction . . . issue his warrant for the apprehension of the person so

9   charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the

10  evidence of criminality may be heard and considered.").

11      It is undisputed that there is an extradition treaty between the United States and Germany

12  that is, and was at all relevant times, in full force and effect.

13      The crime charged (tax evasion) falls within the terms of the extradition treaty.  The 1978

14  Treaty originally specified that extraditable offenses were those listed in an appendix to that treaty.

15  That appendix listed a number of offenses, including "offenses relating to willful evasion of taxes

16  and duties."  (Dkt. 18, Ex. A (1978 Treaty, Appendix)).  The treaty subsequently was amended,

17  essentially expanding the scope of covered offenses to include any offenses punishable under the

18  laws of both countries:

19

20          "Extraditable offenses under the Treaty are offenses which are
            punishable under the laws of both Contracting Parties.    In
21          determining what is an extraditable offense it shall not matter
            whether or not the laws of the Contracting Parties place the offense
22          within the same category of offense or denominate an offense by the
            same terminology, or whether dual criminality follows from Federal,
23          State          or          Laender          [sic]          laws."

24  (1993 Supplementary Treaty, Article 1(a)(1)).  Thus, the treaty reflects the principle of dual

25  criminality, which simply requires that the alleged offenses constitute a crime in both jurisdictions.

26  Oen Yin-Choy, 858 F.2d at 1404; Emami, 834 F.2d at 1450.  "To satisfy dual criminality, the

27  name by which the crime is described in the two countries need not be the same, nor does the

28                                     12

United States District Court
Northern District of California

scope of liability for the crime need to be the same." Oen Yin-Choy, 858 F.2d at 1404 (citing Emami, 834 F.2d at 1450). "Rather, dual criminality exists if the essential character of the acts criminalized by the law of each country are the same and if the laws are substantially analogous." Id. (citations and quotations omitted). "Thus, each element of the offense purportedly committed in a foreign country need not be identical to the elements of a similar offense in the United States. It is enough that the conduct involved is criminal in both countries." Id. at 1404-05 (citations and quotations omitted).

This court readily concludes that Azizi's alleged conduct would be criminally punishable under the laws of the United States. As discussed, he is charged with tax evasion in violation of Section 370 of the German Fiscal Code, and the government alleges that he failed to file tax returns, fraudulently claimed refunds of VAT, and evaded payment of VAT. According to the RFE, Section 370 of the German Fiscal Code provides that such conduct is punishable by up to 5 years imprisonment or a monetary fine. (RFE 96-97). Such conduct is also prohibited in the United States by at least the following statutes, which concern essentially the same acts as those underlying Germany's charges and which are substantially analogous to the cited German statute:

- 26 U.S.C. § 7201 makes it a crime to willfully attempt to evade or defeat any tax;[9]

- 26 U.S.C. § 7207 makes it a crime to file false or fraudulent tax returns, statements, or other documents;[10]

_____

[9] "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution." 26 U.S.C. § 7201.

[10] "Any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both. Any person required pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527 to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both." 26 U.S.C. § 7207.

United States District Court
Northern District of California

- 18 U.S.C. § 287 makes it a crime to present false claims to a government agency;[11]

- 18 U.S.C. § 1001 makes it a crime to make a false statement to a government agency;[12]

- 18 U.S.C. § 1003 makes it a crime to make a fraudulent demand for money on the government;[13] and

- 18 U.S.C. § 1014 makes it a crime to make any false statement to the Federal Reserve Bank.[14]

---

[11] "Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title."  28 U.S.C. § 287.

[12] The statute provides, in relevant part:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

18 U.S.C. § 1001(a).

[13] "Whoever knowingly and fraudulently demands or endeavors to obtain any share or sum in the public stocks of the United States, or to have any part thereof transferred, assigned, sold, or conveyed, or to have any annuity, dividend, pension, wages, gratuity, or other debt due from the United States, or any part thereof, received, or paid by virtue of any false, forged, or counterfeited power of attorney, authority, or instrument, shall be fined under this title or imprisoned not more than five years, or both; but if the sum or value so obtained or attempted to be obtained does not exceed $1,000, he shall be fined under this title or imprisoned not more than one year, or both." 18 U.S.C. § 1003.

[14] The statute provides, in relevant part:  "Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . a Federal Reserve bank . . . shall be fined not more than $1,000,000 or

United States District Court
Northern District of California

United States District Court
Northern District of California

See generally, e.g., In re Extradition of Matus, 784 F. Supp. 1052, 1055 (S.D.N.Y. 1992) (concluding that Chilean charges of VAT fraud and evasion are also crimes violating 18 U.S.C. § 287, 18 U.S.C. § 1003, and 26 U.S.C. § 7207).  The principle of dual criminality is satisfied, and the offenses charged are covered by the extradition treaty.

### B.  There is Probable Cause to Believe that Azizi Committed the Crimes Charged

As discussed, in an extradition proceeding, "the country seeking extradition is not required to produce all its evidence at an extradition hearing and it is not [this court's] role to determine whether there is sufficient evidence to convict the accused." Quinn, 783 F.2d at 815.  "The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." Id.  This means that the undersigned must "determine whether there is 'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" Trinidad, 754 F. Supp.2d at 1081 (quoting Coleman v. Burnett, 477 F.2d 1187, 1202 (D.C.Cir.1973)).

### 1.  Identity

As part of its probable cause analysis, this court must determine whether the party before it is the party named in the extradition complaint.  Manta, 518 F.3d at 1143; Hooker, 573 F.2d at 1367.  Azizi has never argued or claimed that he is not the party named in the extradition complaint.  Additionally, he has appeared in person before this court on several occasions, and he appears to be the same individual identified in photos in the RFE.  (RFE 16, 84, 110)  Moreover, the Report of Investigation of Deputy United States Marshal Christopher Hulse reveals that Azizi told Deputy Hulse that he obtained German citizenship sometime between 2003 and 2004; that he lived in Germany until 2006; that he was the manager of an electronics company in Germany called WOC GmbH; that he was the sales manager of a company called Wega Mobile; that his cousin Habib Soori was the owner of  iTrading GmbH, iCell Gmblt and Co KG, AS Handel

imprisoned not more than 30 years, or both."  18 U.S.C. § 1014.

United States District Court
Northern District of California

GmbH, and My iCell Gmblt; that his brother, Selaiman Azizi, was the co-owner of Nexo Chakfa GmbH with Yusuf Güles; and that he also has a sister, Hosai Azizi, and another brother, Said Azizi.  (Dkt. 37 at 6).  These relatives and companies are mentioned throughout the RFE.  (See, e.g., RFE at 2, 12, 17-20, 30, 58-59, 63-64, 89).  Further, the government says that the unredacted copy of Deputy Hulse's report reveals that Azizi gave him the same birthdate as the one specified in the RFE (RFE 111).  Azizi, who was given a copy of the unredacted report (see Dkt. 37 at 3), has never challenged that assertion.  The undersigned finds that Azizi is the party named in the extradition complaint.

### 2.  VAT Overview

As its name suggests, VAT essentially is a tax on the value added to a product, imposed at each stage in the supply chain, from manufacture to delivery of the finished product to the final consumer.  "The VAT is somewhat like U.S. sales tax in that it is based upon the value of a physical good.  Unlike, the U.S. sales tax, however, the VAT is imposed at each step in production, from the processing of raw materials to the distribution of final products."  Matus, 784 F. Supp. at 1055.  Each seller in the supply chain charges customers VAT based on the value it has added to the product.  For each buyer in the supply chain, the VAT is a tax on the purchase price paid.  Each seller in the chain must report its sales and pay to the government the VAT due, but may deduct from that payment any VAT it already paid on the product.  The VAT a business pays to another business for supplies is called "input VAT."  (RFE 2).  When that business, in turn, sells its goods, it charges customers VAT on the value it added to the products.  And, that business must also report its sales and pay the relevant VAT due at that stage in the chain, but it may deduct from that payment the input VAT it paid to its supplier.  (RFE 2).  In this way, goods make their way through the chain, with each buyer and seller reporting sales and paying the relevant VAT at each step.  Ultimately, the VAT is borne entirely by final consumers, who cannot deduct any VAT from their purchases.  (RFE 3).

According to the RFE, special rules apply to goods that are imported or exported between different countries.  For imports/exports between different EU members (i.e., intra-Community

transactions), this basically means:

(1) Exported products are exempt from VAT, and the exporting country collects no VAT on such sales.  (RFE 3).

(2) Imported products are subject to a "reverse charge," meaning that an importer pays VAT (at the importing country's rate) on the purchase price when the goods are first sold into the country, but the importer is entitled to a credit or refund of that VAT payment.  In other words, intra-Community supplies move from one jurisdiction to another, essentially tax-free.  For example, according to the RFE, Germany treats a business' intra-Community supplies as tax-exempt; and, while the purchase tax paid for the supplies must be reported, that amount may simultaneously be claimed as a deduction of input VAT.  (RFE 4, 98).

These rules reflect the principle that VAT should be collected in the country where the end-consumer ultimately acquires the goods.  (RFE 3-4).  Once a good is imported, the domestic business sells it downstream through a supply chain as usual, and VAT is collected at each step, as described above.

### 3.  Missing Trader Intra-Community Fraud/Carousel Fraud

Because of the way in which VAT is treated on transactions between different EU countries, VAT is vulnerable to certain types of fraud.  Germany alleges that Azizi accomplished the charged tax offenses through gang-based "Missing Trader Intra-Community" (MTIC) fraud, also known as "carousel" fraud, in which criminal gangs illegally attempt to obtain refunds of input tax.  (RFE 4).  According to the government, this kind of fraud operates as follows:

Like many countries with a VAT system, Germany requires businesses to be registered for VAT purposes.  In MTIC fraud, the so-called "missing trader" is the initial domestic purchaser in the delivery chain, but often is a sham, non-existent company without any real business activity, set up solely for the purpose of VAT fraud.  (RFE 4).  Or, the missing trader might be an actual company, but nonetheless is one that does not comply with its obligations to declare and pay VAT to the tax office.  (Id.).  Essentially, the missing trader purchases intra-Community supplies and

United States District Court
Northern District of California

United States District Court
Northern District of California

1   charges VAT when the goods are re-sold down the supply chain, but then disappears without

2   making the required VAT payment to the government.  The government says that because missing

3   traders do not declare or pay VAT as they should, they tend to be conspicuous, and are normally

4   withdrawn from the market after a short period and replaced with other sham companies.  (RFE 5).

5        "Carousel" fraud refers to a scheme in which a missing trader purports to "sell" goods

6   downstream through a supply chain comprised of pre-determined and fixed "buyers," known as

7   "buffer" companies.  (RFE 4).  Based on information from Germany's tax investigation offices,

8   the government says that it is already known from the outset when goods are delivered from one

9   country to another, that the goods will be moved from a missing trader to a buffer who acts as the

10  purchaser.  (RFE 4-5).  According to the government, no legal transactions or sales to end

11  consumers are ever contemplated under this scheme.  (RFE 6).  Instead, the goods purportedly are

12  "sold" down the chain from a missing trader to buffers through bogus transactions.  The missing

13  trader is obliged to report its sales and to pay taxes through periodic VAT returns and annual tax

14  returns; but, it does not do so, resulting in a loss in the amount of the undeclared taxes.  (RFE 5).

15  Because the missing trader does not declare or pay VAT, the government says that the missing

16  trader is able to resell goods with only a small mark-up, resulting in a considerable market

17  advantage, i.e., it is able to sell the goods at lower prices than those charged by tax-paying

18  competitors.  (Id.).

19       The missing trader's function, according to the RFE, is to issue invoices purporting to

20  show sales transactions, thereby giving the downstream buffers the opportunity to claim

21  unwarranted deductions of input VAT based on the fake invoices.  (RFE 5).  In other words, says

22  the government, those fake purchase invoices are essentially a "check for cash" with respect to the

23  Tax Office.  (Id.).  According to the RFE, buffer companies further down the chain ostensibly

24  fulfill their tax duties and submit tax returns; however, the VAT payable is offset by the bogus

25  input tax from the fake purchase invoices issued by missing traders.  (RFE 5-6).  The government

26  says that buffer companies' VAT returns often show that, after joining the fraud carousel, taxable

27  sales and input-tax amounts increase by large amounts, but the amount of VAT payable is small.

28

1    (RFE 6).

2          According to the RFE, often several buffer companies are used in the fraud carousel in

3    order to conceal the delivery paths and carousel structure.  Thus, buffer companies who

4    "purchase" goods from a missing trader, in turn, "sell" the goods to other buffer companies, who

5    then pass the goods to still other buffers.  The buffers, says the government, usually are rewarded

6    for their participation in the chain with the profit mark-up when invoicing the goods to the next

7    buffer.  (RFE 6).  And, because of the pre-defined delivery structures in a chain, buffers are able to

8    engage in profitable transactions at regular intervals, without risk, effort, or business initiative and

9    without any real market or need for the subject goods.  (Id.).  But, if there is an actual market for

10   the goods, the government says that buffers still benefit from the fraud by the ability to sell the

11   goods at lower prices than those charged by tax-paying competitors.  (RFE 6).

12         The government says that the goods eventually pass from buffers to a so-called

13   "distributor," who ensures that the goods re-enter the same fraudulent supply chain, usually

14   through a VAT-exempt sale to a gang member in another EU country.  (RFE 6).  Thus, this type of

15   fraud operates on a so-called "carousel," because the same "goods" may be moved round and

16   round again through the supply chain.  (RFE 6).  According to prosecutor Brorhilker, the law does

17   not permit tax refunds (i.e., deductions of input tax) for sales of such consecutively linked delivery

18   chains established for the purpose of VAT fraud because such sales are not classified economic

19   activity or services within the meaning of the VAT Act.  (RFE 7).  According to the RFE, fraud

20   carousels result in high VAT damages and are particularly prevalent with respect to computer

21   processors, cell phones, play stations, copper cathodes, gold, automobiles, and emission allowance

22   certificates.  (RFE 3-4).

23         The government says that, early on, when perpetrators first began engaging in carousel

24   fraud, the goods allegedly traded did not actually exist and the purported movement of goods was

25   contrived.  (RFE 7).  After investigators made that discovery, the government says that

26   perpetrators began trading in actual existing goods; but, the goods are taken to certain freight

27   forwarders "on hold" and are stored there while the goods repeatedly change hands, within a short

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  period of time, through the fraudulent supply chain; or, the goods are stored with specific freight

2  forwarders, or transferred (or seemingly transferred) between them.  (RFE 5, 7).

3       Additionally, the government says that when tax authorities began to look at whether the

4  same goods passed through the delivery chains several times, perpetrators established databases to

5  track whether a product (e.g., a cell phone with a registration number (IMEI number)) had already

6  been sold to a particular buffer in the chain.  If so, then steps were taken to ensure that the cell

7  phone was sold to a different buffer.  The net result, says the government, is that the perpetrators

8  managed to avoid the chain previously used for the fraud, but were required to pass more goods

9  through the system.  Thus, according to the government, in a fraud carousel, all goods are

10  imported, even if it makes no business sense.  For example, perpetrators will import goods with 3-

11  pin plugs---usable in Germany only with special adapters---making the goods almost unsellable in

12  Germany.  The government says that this practice suggests that such goods are imported from the

13  outset solely for the purpose of evading VAT in Germany and then later re-exporting the goods

14  out of the country.  (RFE 7).

15      **4.  VAT fraud re trade in emission rights**

16       According to the RFE, since May 2009, VAT fraud in connection with the trade of

17  emission allowances for greenhouse gases has been on the rise.  (RFE 8).  The government says

18  that the trade in emission allowances stems from the EU's efforts to achieve the climate protection

19  goal of the Kyoto-Protocol, through which the EU and other countries work to achieve lasting

20  reductions in their combined emissions of the six most important greenhouse gases, including

21  carbon dioxide ($CO_2$).  (RFE 8).  Germany says that, based upon an EU directive establishing a

22  system for the trade in greenhouse gas emissions within the EU, it enacted a law that requires

23  companies with huge greenhouse gas emissions to participate in the emission allowances trade

24  system.  Essentially, plant operators are assigned emission allowances representing the reduction

25  targeted within a defined period by official agencies.  One emission allowance permits one metric

26  ton of greenhouse gases to be emitted.  (FRE 9).

27       According to the RFE:  The national emissions registry in each EU member state is

28

United States District Court
Northern District of California

1  responsible for allocating and managing emission rights, e.g., in Germany, the German Emission

2  Trading Registry.  Each registry maintains electronic emission trading accounts for every natural

3  or legal person who, after review of documents required to be submitted, is admitted to the

4  emission allowances trade.  Each account shows the rights held to emission allowances.  Each

5  emission allowance is unique and is assigned a national origin code and a serial number, which is

6  easily recognized by all trading parties.  (RFE 9).

7          Additionally, the government says that the national emission registries of EU member

8  states are linked via the Community Independent Transaction Log (CITL) in Brussels, as well as

9  by the International Transaction Log (ITL) in the Climate Change Secretariat of the United

10  Nations.  (RFE 9-10).  The CITL monitors and reconciles the emission trading accounts

11  throughout Europe, and the ITL does the same for accounts worldwide.  (RFE 10).

12          But, according to the RFE, emission allowances may be traded in a variety of ways; and,

13  actual trading is organized, not by the state, but rather, by the parties to the trade:

14       • Trading can take place between plant operators directly or between brokers.

15       • Emission allowances can also be traded on exchanges, such as the European

16          Climate Exchange in London, the European Energy Exchange in Leipzig, the

17          Energy Exchange Austria in Vienna, or the environmental exchange Bluenext in

18          Paris.  In those instances, the transfer of the emissions rights and issuance of

19          invoices takes place through the relevant exchange clearing office, not the traders.

20       • Trades can also take place between accounts within a national registry and also

21          between accounts in different registries of EU member states.

22       • Emission allowances are also traded over-the-counter (OTC), in which case the

23          trade is made through transfers to the parties' emission trading registry accounts,

24          with such transfers being made between accounts much like transfers are made

25          through online banking.  Invoices in OTC trades are issued in the same way.

26  (RFE 9-10).

27          The government says that the OTC trade in emission allowances is frequently exploited by

28                                         21

United States District Court
Northern District of California

perpetrators of carousel fraud.  (RFE 10).  According to the RFE, in the second half of 2009, information gathered by the Federal Criminal Police Office indicated that a number of persons and companies were working together with a group of perpetrators (comprised of mostly British citizens of Indian or Pakistani origin) to establish constantly changing VAT chains throughout Germany in order to continue evading VAT throughout all of Europe.  (RFE 10).  The RFE says this was the subject of various press reports in Germany; and, there were also indicators that perpetrators were using the VAT procured through such fraud, not only for personal enrichment, but also to finance terrorism.  (FRE 11).

Thereafter, the government says that a large number of companies became active and entered the emission allowances trade in various regions in Germany, including the Rhine-Main territory, and the greater regions of Hamburg, Cologne/Düsseldorf, Berlin, and Munich.  (FRE 11).  These companies, according to the RFE, share certain common characteristics:

- The companies initially are founded as shelf companies.

- Shares in the companies are held primarily by foreign citizens who do not reside in Germany, and shareholders are simultaneously appointed managing directors of the companies.

- The companies are renamed and their registered offices are relocated, in many instances, to the addresses of office-service companies.

- The companies keep emission trading accounts primarily in Danish or German emission trading registries.

- Emission allowances are traded in blocks, extremely quickly, within a delivery chain.

- The price per emission allowance is, in some instances, significantly below the Leipzig exchange reference price.

- Payment for the emission allowances takes place retrospectively within the delivery chain after the last domestic purchaser pays and its trace is lost in a foreign country.

- Often, payments are not made by pre-suppliers, as would normally happen, but

United States District Court
Northern District of California

1    rather are paid directly by the so-called "chain feeder," i.e., the company abroad

2    invoicing fraudulent goods to Germany.

3    (RFE 11-12).

4        Against this backdrop, the court now turns to the government's investigation and charges

5    against Azizi.  As discussed, he is alleged to have engaged in numerous counts of tax evasion,

6    acting jointly with accomplices and gang members, through gang-based missing trader/carousel

7    fraud.  Germany has submitted its evidence through the sworn affidavit of prosecutor Brorhilker,

8    which comprises 113 pages of detailed summaries of witness statements (including statements

9    Azizi himself provided to investigating authorities), and of documents seized during searches of

10   the pertinent residential and business premises, as well as of other information obtained in the

11   government's investigation thus far.

12   **5.  Alleged offenses re WOC GmbH (Counts 1-8)**

13       According to the government, Azizi founded and operated WOC GmbH (WOC) in the cell

14   phone business.  Although Hosai Azizi was the company's official managing director, the

15   authorities say that, based on their investigation, Samir Azizi actually operated WOC as the

16   company's de facto managing director and used WOC in a VAT fraud carousel.

17       The government says that Azizi's control over WOC is supported by statements Hosai

18   Azizi made to authorities.  According to Brorhilker, during a September 15, 2010 interrogation,

19   Hosai, who was separately prosecuted,[15] said that Samir Azizi asked her in 2007 if she would set

20   up WOC for him because he was still a minor at that time.  According to Hosai, Samir Azizi

21   prepared all of the necessary documents, including contracts required to establish the company;

22   and, thereafter Samir always prepared documents Hosai was supposed to sign.  Hosai says that she

23   herself was seldom on WOC's premises because she was already working part-time for another

24   store in Siegen.  (RFE 13-14).

25

26   [15] According to the RFE:  Hosai Azizi was held in pretrial detention in a Cologne prison and was
     released by prosecutors after she admitted the charges against her and €450,000.00 was paid to

27   settle the tax debts.  She was sentenced by the Cologne Local Court to a suspended sentence of 1
     year for aiding and abetting tax evasion.  (RFE 26).

28

United States District Court
Northern District of California

The government says that Samir Azizi's control over WOC is also confirmed through a statement he himself provided to authorities on September 8, 2010. According to the RFE, Azizi told investigators that he began in the cell phone trade in 2006. Only 16 years old at that time, Azizi said he asked his sister Helai Azizi and his sister Hosai, to register cell phone businesses for him, with Helai being asked to found AT Azizi Telekom and Hosai being asked to found WOC. Although his sisters were the official managing directors, Azizi told them that this was a mere formality; and, his sisters were not to intervene in the companies' ongoing business transactions, which were to be performed by him alone. Azizi further stated that he involved his sisters only when absolutely necessary in dealings with banks and authorities. Whenever his sisters did take on more responsibilities in a specific case, it was always on his instructions. And, he assumed full responsibility for the resulting VAT debts. (RFE 14, 17, 24). As for his activities with respect to WOC, Azizi explained: "I then founded WOC GmbH. I wanted to make a new start and do normal business. . . . I wanted to stay clean with WOC, and bought equipment and sold it on EBay. But, that didn't work very well. So I had to take the normal way again, because VAT defrauding companies offer the equipment much cheaper. People all over the world know that if you want to sell cell phones in Germany, they must have passed through Germany already, i.e. originate from a fraud, otherwise you can't do it, otherwise you can't make a profit." (RFE 17).

Additionally, the government says that seized documents do not show any actual business activity conducted by Hosai, but rather, demonstrate that the business was being run by Samir Azizi. Specifically, the government says that the documents show that he:

- finalized the lease contract for business premises on Richard-Byrd-Strasse 18, as well as a June 15, 2007 Regus Business Center Service Contract, and the associated debit order;

- acted as WOC's representative in dealings with the account-keeping bank and was authorized to make withdrawals from business accounts;

- signed the February 26, 2008 licensing and service agreement for software with Cologne Savings Bank;

24

1

- signed contracts with Creditreform;

2

- is described as WOC's managing director in a February 15, 2008 sponsoring

3

  agreement with OrelMobile GmbH;

4

- handled the accounts, salary payments, and tax matters;

5

- acted as the source of information to revenue officers during a VAT audit;

6

- claimed to be WOC's managing director when arranging for life insurance through

7

  R+V Lebensversicherung and told them that he used WOC's profits to cover all of

8

  the Azizi family's liabilities and costs of living; and

9

- acted as WOC's managing director when dealing with UPS and in connection with

10

  equipment for the office space.

11 (FRE 20). According to Brorhilker, under German caselaw, "a person who has taken over de

12 factor management with the consent of the shareholders without formal appointment, who actually

13 performs it and holds a commanding position towards the official managing director or at least has

14 significant dominance, must be recognizable as managing director, i.e., when all dispositions

15 internally and in relations with third parties emanate largely from the de facto managing director

16 and if he exercises a decisive influence on all business matters otherwise." (RFE 20-21). The

17 government claims that Samir Azizi was required to file annual VAT returns and periodic VAT

18 returns with the relevant tax office under Sections 34, 35, 149, and 150 of the German Fiscal Code

19 in conjunction with Section 18 of the VAT Act. (RFE 21). Their investigation, says the

20 authorities, reveals that Azizi did not do so and instead concealed sales and, in some instances,

21 illegally deducted input tax based on bogus purchase invoices. (RFE 21).

22      The government says its investigation revealed that WOC was part of a fraud carousel

23 involving at least two other companies also allegedly controlled by Azizi:   AT Azizi Telekom, the

24 cell phone company established with the help of his sister, Helai Azizi; and Narges.com, a

25 company allegedly established by Azizi with the help of Narges Sadat, who allegedly was Azizi's

26 friend and the company's official managing director.

27      In a statement given to authorities, Azizi said that, through AT Azizi Telekom, he

28

United States District Court
Northern District of California

25

purchased phones in Luxembourg and the Netherlands and physically transferred them to WOC before WOC had a VAT identification number.  (RFE 18).  The government says that accounting documents confiscated from WOC include purchase invoices from AT Azizi Telekom.  But, according to the government's investigation, AT Azizi Telekom is a sham company controlled by Samir Azizi and involved in VAT fraud chain as WOC's supplier:

- In a statement to authorities, Azizi said that he asked Helai to form AT Azizi Telekom on his behalf, but that he would handle all business transactions and she was not to intervene.

- Further, the government says that its investigation of AT Azizi Telekom revealed that Azizi sold goods under cost through the company, indicating that a profit could only be earned if the VAT was not duly paid.

- Additionally, the authorities claim that invoices show that deliveries did not match any corresponding purchase of goods.  For example, an invoiced sum for €4,691,713.00 was inconsistent with the corresponding €2,319,883.00 purchase; and, bank accounts through which payments were made did not indicate that goods had been purchased on a greater scale.

- According to the RFE, the fact that the purported supplier, AT Azizi Telekom, and the purported customer, WOC, were both controlled by Azizi is further indication that the companies had no legitimate commercial purpose and that no actual supplier-customer relationship existed between them.

(RFE 24-25).

Narges.com reportedly also sold cell phones to WOC, but the government says that, according to a February 2008 VAT audit conducted by the Wiesbaden Tax Office, Narges.com had no actual business operations.[16]  (RFE 21).  And, during a September 23, 2008 search of

---

[16] For this reason, the government says that Narges.com was deregistered on July 9, 2008, after repeated demands for submission of suitable documents about the company's activities went unheeded.  (RFE 21).

United States District Court
Northern District of California

Narges.com's business premises, investigators discovered that the listed address was in an apartment in a purely residential neighborhood; there was no indication of any commercial business activity in the building or in the apartment of the alleged proprietor, Narges Sadat; and no business documents were found, other than documents concerning Narges.com's trade registration and some letters from the Wiesbaden Tax Office about the company's new registration. Specifically, the government says that no correspondence or invoices were found; no deliveries from the EU territory to the company were ever reported to the VAT information exchange system; and there were no significant payment transactions in the bank account identified on invoices.  (RFE 21-22).

The government further claims that their investigation (which included inspection of the programs and data stored on WOC's computers) revealed that the transactions between Narges.com and WOC were bogus and that the Narges.com invoices were drafted on and stored on WOC's computers; the software used to prepare the invoices was licensed to Samir Azizi (not Narges.com) and was installed on WOC's computers on February 24, 2007 (nearly a year before Narges.com was registered); and the related delivery notes were prepared and stored in the same way.  (RFE 21-23).  In other words, the government claims that Azizi was invoicing himself for fake transactions in order to claim unwarranted refunds of input tax based on sham transactions between Narges.com and WOC.

Additionally, the government says that there is evidence linking Sadat (who was separately prosecuted) and Narges.com, to Samir Azizi:   Sadat possessed a WOC business card on which Samir Azizi is identified as the managing director.  Two calls were made from WOC to Sadat's cell phone on March 11, 2008.  According to a notebook kept by Hosai Azizi, Sadat visited the Azizi family on September 4, 2008.  And, on July 22, 2009, Hosai Azizi had a copy of a letter from Sadat's tax accountant sent to the Wiesbaden Tax Office on March 3, 2008 for Sadat's tax file.  (RFE 22).

According to the government, documents and information gathered by investigators shows that Sadat simply registered Narges.com with the city of Wiesbaden on January 11, 2008, signed

United States District Court
Northern District of California

the revenue registration questionnaire, and submitted it to the Wiesbaden Tax Office. She was given a tax number, confirming that she was registered with the Wiesbaden II Tax Office for the purpose of income tax, trade tax, and VAT since January 11, 2008. She was also issued a VAT identification number by the Federal Central Tax Office on February 2, 2008. According to the government, Sadat faxed these documents to Samir Azizi as the person responsible for WOC, on February 19, 2008. Two days later, authorities say that Sadat opened a checking account with Deutsche Bank Privat-und Geschäftskunden AG, and notified Azizi of the account number and her tax number, so that he could include those details in invoices he himself wrote in the name of Narges.com. (RFE 23).

According to the RFE, there were two other entities who reportedly transacted business with WOC: Fonversand and Telesonic. In a statement to the authorities, Azizi described them as follows: "The situation with private individuals was done this way: lots of young people in Frankfurt, schoolchildren, students, etc., had to buy one or two prepaid cell phones from different consumer-electronics stores, e.g., Saturn, Media Markt. The person who was controlling the whole operation then sold larger quantities of these cell phones in an invoice to the companies in Frankfurt, i.e., always around 100-200 units. And that was how the chain began. The young persons were then already part of his gang. The companies in Frankfurt had the receipts of the young persons from the electronics stores. I could have had them too. But, I didn't want to, as it did make no sense to me. The whole thing was probably already a subsidy fraud. I then bought from these companies in Frankfurt. They did not write me any invoices either; the deals were all done in cash. Since I never filed any VAT returns for WOC, tax investigators came at the end of 2007 or beginning of 2008." (RFE 173-174). Azizi further stated that, after three managers from Fonversand and Telesonic showed up one day, threatened Hosai, and demanded money, "I really did operate illegally. This meant that I was forced to start borrowing money from the State. That meant purchasing in Luxembourg and Holland. Then selling the goods in Germany and not declaring the VAT." (RFE 18).

The government charges Azizi with 2 counts of failing to declare sales (i.e., failing to file

United States District Court
Northern District of California

tax returns, called "non-submission" in the RFE) and 6 counts of claiming unwarranted refunds of input tax, resulting in total damages of €1,238,661.00 as follows:

- Count 1:  June 1, 2009 (non-submission), €148,214.00
- Count 2:  April 4, 2008 (misrepresentation), €42,906.00
- Count 3:  May 13, 2008 (misrepresentation), €58,329.00
- Count 4:  June 3, 2008 (misrepresentation), €76,559.00
- Count 5:  July 9, 2008 (misrepresentation), €50,375.00
- Count 6:  August 11, 2008 (misrepresentation), €151,051.00
- Count 7:  September 10, 2008 (misrepresentation), €310,365.00
- Count 8:  September 11, 2008 (non-submission), €400,862.00

The evidence before the court is sufficient to establish probable cause to believe that Samir Azizi committed the alleged offenses charged in counts 1-8.

### 6.  Alleged offenses re Ferrograph GmbH (Counts 9-10)

Counts 9 and 10 charge Azizi with non-submission of tax returns resulting in fiscal loss of €199,424.00 with respect to Ferrograph GmbH (Ferrograph) as follows:

- Count 9:  August 11, 2009, €5,678,00
- Count 10:  September 11, 2009, €193,746.00

(RFE 28-29).  According to the RFE, in a statement submitted to the authorities via his attorney, Azizi admitted these charges.  (RFE 28).

The government says that its investigation revealed the following:   Ferrograph was a shelf company formed on December 8, 1997 and purchased by Azizi on June 5, 2009.  Ferrograph was founded by a notarized contract, with Mohammad Rhabaran and Ulrich Meves, a solicitor, serving as its shareholders.  The company's registered purpose was trading ferroalloys and all kinds of raw materials, but had been inactive since 2003.  After the corporate shell was purchased by Azizi in 2009, the company began in the cell phone trade; its registered purpose, however, remained unchanged.  The government says that additional suspicion of VAT evasion offenses was raised when Ferrograph, which had been inactive for over a decade, transacted more than €3 million in

29

the two months after Azizi acquired the company, despite strong price competition in the cell phone market.  (RFE 27).

In the course of its investigation, the government says that it found no one who acted for Ferrograph or who was involved in the company's operations.  Instead, authorities found only employees or interns who were given simple clerical tasks, such as answering phones and filing or forwarding invoices.  One Miguel Angel Miranda Pina (reportedly, a resident of Hayward, California) was Ferrograph's formal manager, but was not found in Germany.  Based on email evidence, the government says that email contacts for Ferrograph identified only as "Howard Dean" and "Sunjay Gupta" were forwarded by the American forwarding service "deref" to the Yahoo address "samir.azizi@wocgmbh."  (RFE 27-28).

According to Brorhilker, at a hearing, solicitor Meves stated that he founded Ferrograph, which remained inactive for a long time afterward.  Then, in May or June 2009, he received a phone call from someone in the United States (possibly Pina) who said that he was looking for a "living company."  Meves offered Ferrograph for sale; and, according to Meves, Azizi came to his office several days later, claiming that he represented Pina.  Meves says he negotiated with Azizi for the sale of the company, the sales contract was notarized on September 5, 2009, and Azizi paid the sales price in cash.  It was then that Meves says he believed Azizi had used Pina as an excuse; but, Meves stated that he did not care since he had intended to get rid of Ferrograph anyway.  (RFE 28).

The government says that, according to its investigation, Ferrograph was the "missing trader" in a VAT fraud carousel that re-sold cell phones to downstream buffer companies for less than cost.  The subject phones, according to the RFE, were exclusively bought in other EU countries and then imported into Germany and sold to German "customers."  According to investigators, these "customers" included Wega Mobile GmbH,[17] Fonversand GmbH,[18] Thaysen

---

[17] As discussed more fully below, the government alleges that Wega Mobile GmbH is another company Azizi controlled and used in a VAT fraud chain.

[18] As discussed above, Azizi identified Fonversand as one of the alleged "suppliers" of WOC.

30

United States District Court
Northern District of California

Telecom GmbH & Co. KG,[19] IT2U GmbH, and Trianel GmbH.  The authorities say that they are separately investigating every person responsible for these companies for suspected VAT evasion offenses.  (RFE 27).  The government claims that Azizi, acting as Ferrograph's de facto manager, issued invoices showing separate VAT amounts and was obliged to file both annual and periodic VAT returns to the Cologne Tax Office, but failed to do so.  (RFE 28-29).

Additionally, the government says that it has evidence suggesting that Ferrograph might also be involved in VAT fraud concerning emission allowances.  During a search of an office service company that reportedly worked for Ferrograph, authorities found an identification card for one Imran Patel, who is being separately prosecuted and was found to be the person responsible for I.I. First Euro Trading GmbH, an alleged missing trader.[20]  Moreover, Ferrograph is registered in the German Emissions Trading Registry, with Patel registered as second attorney. (RFE 29).

The evidence before the court is sufficient to establish probable cause to believe that Samir Azizi committed the alleged offenses charged in counts 9-10.

### 7.  Alleged offenses re Wega Mobile GmbH (Counts 11-20)

Based in part on information obtained during the investigation of WOC, authorities say they began to suspect that Azizi also controlled Wega Mobile GmbH (Wega Mobile) and integrated the company in a VAT fraud carousel.  According to the government, Azizi ran Wega Mobile as de facto managing director, together with Mehmet Tunc (separately prosecuted) who was the official manager.  Azizi allegedly integrated Wega Mobile as a buffer company in a VAT fraud carousel and then claimed unwarranted refunds of input tax based on purchase invoices from alleged suppliers, knowing that the invoices were not based on any actual supplies or services,

---

[19] As discussed more fully below, Thaysen Telekom GmbH & Co. KG is another company allegedly used in various VAT fraud chains in which Azizi was involved.

[20] The government's allegations concerning I.I. First Euro Trading GmbH are discussed more fully below.

resulting in fiscal damages of €2,955,858.00.[21]  The dates of the alleged offenses and the subject amounts are as follows:

- Count 11:  March 25, 2009, €83,099.00
- Count 12:  March 19, 2009, €264,957.00
- Count 13:  April 14, 2009, €292,889.00
- Count 14:  May 11, 2009, €272,447.00
- Count 15:  May 12, 2009, €331,548.00
- Count 16:  June 26, 2009, €574,557.00
- Count 17:  July 10, 2009, €364,283.00
- Count 18:  September 11, 2009, €578,099.00
- Count 19:  October 8, 2009, €152,405.00
- Count 20:  November 19, 2009, €41,574.00

According to the government:   Wega Mobile, with its registered office in Solingren, was registered in the commercial register on November 21, 2008.  Tunc and Fariah Maqdoor (Azizi's cousin and fiancee) were shareholders who each owned 50% of the company.  Maqdoor was also a "trustee" of WOC.  Azizi's sister, Helai, was an employee.  (RFE 30).

The authorities obtained court orders for the search of homes and business premises.  According to the RFE, based on accounting documents, authorities determined that Wega Mobile purchased cell phones from known "missing traders" and then immediately resold them for less than the purchase price.  For example, the government says that accounting documents show that Wega Mobile (1) purchased Apple 3GS 16 GB phones from a company called Carex in France on August 18, 2009 for €655.00 and then resold the phones on August 19, 2009 for €618.00 and (2) purchased Apple 3GS 32 GB from Carex in France for €755.00 and resold them the next day for €710.00  (RFE 30).

---

[21] The government says that, in some instances, the tax office ultimately did not approve payment on the submitted claims for a refund.  Nevertheless, the government says that those claims are considered attempted offenses.

United States District Court
Northern District of California

1   Additionally, the government says that confiscated forwarding agent files show that Wega

2   Mobile participated in an intra-EU carousel in which it purchased, sold, exported, and repurchased

3   the same phones---and, in some instances, purchased and resold the phones before its supplier had

4   even acquired them.  For example, forwarding agent folder 006763/2009, according to the RFE,

5   reveals the following VAT fraud chain in which Ferrograph[22] functioned as a missing trader that

6   sold cell phones, at less than cost, to Wega Mobile, a buffer:   On July 8, 2009, a company called

7   Prizeflex UK sold Nokia E71 phones to Ferrograph with a unit price of €230.00.  That same day,

8   Ferrograph, acting as the missing trader, sold the phones to Wega Mobile at a price of €192.00,

9   i.e., less than cost.  That same day, the phones were re-sold to a company called Celltech, HK at a

10  price of €200.  (RFE 30-31).  The government says the same file also reveals the following chain:

11  On July 8, 2009, Prizeflex UK sold Nokia E51 phones to Ferrograph at a price of €137.00.  That

12  same day, Ferrograph sold the phones at a price of €120.00 (again, below cost) to Wega Mobile.

13  That same day, the phones were resold to Celltech HK at a price of €123.00.  (RFE 31).

14   The government claims that documents show that WOC was another "missing trader" that

15  sold phones (below cost) to Wega Mobile, which functioned as a buffer.  According to the

16  authorities, on February 2, 2009, a company called Aircall, UK sold Nokia 6600 cell phones to

17  WOC at a price of €175.00.  And, that same day, WOC re-sold the phones to Wega Mobile at a

18  price of €160.00.  (RFE 31).

19   Confiscated forwarding agent files and release records, says the government, further

20  demonstrate that these were fraudulent supply chains.  According to the RFE, records show that

21  goods are purportedly released by one company to others in the chain, when the goods never

22  actually left the storage of the forwarding agent.  For example, the government says that

23  forwarding agent file no. 006861/2009 shows that on July 15, 2009, Ferrograph declared the

24  release of goods to Wega Mobile, which in turn declared the release of the goods to Prizeflex on

25  July 16, 2009.  The goods were then declared released to Ferrograph that same day, even though

26

27  [22] As discussed above, the government says that Azizi has admitted to charges of tax evasion in
    connection with Ferrograph.

28                                                  33

the government says that the goods never left the storage of the forwarding agent, RTR.  (RFE 31-32).

According to the government, yet another confiscated forwarding agent file, no. RTR 005989/2009, shows that a company called Dekor GmbH, the first company in the delivery chain, released cell phones to Venus GmbH on April 16, 2009; Venus GmbH then released the goods to Wega Mobile, which reportedly released the goods to H-O-T Phone GmbH on April 17, 2009. However, the government says that records show that Dekor GmbH first received the goods from the supplier G10, UK on April 17, 2009, i.e., the day after Dekor supposedly released the goods to Venus GmbH.  (RFE 32).

Based on emails and chat protocols, the authorities say that, although Tunc was Wega Mobile's official manager, Azizi was the one who actually ran the company as its de facto managing director.  According to the RFE, MSN chat protocols show that when customers asked for an email contact, Helai Azizi specified "samir@wegamobile.com" and "samir.azizi@wocgmbh.com."  (RFE 32).  Additionally, Samir Azizi and Maqdoor are identified as the addressees in the "Statement of Account."  (Id.).

Brorhilker says that Helai Azizi told authorities that she always acted on Samir Azizi's instructions:   At his request, she previously helped him register the business AT Azizi Telekom; and, later, she worked for Wega Mobile, again at his request.  According to Helai, Samir always gave her the names of suppliers and customers with whom she should establish contact.  She further stated that Samir frequently was abroad; and, whenever he was away, she never knew at what price she was to purchase or sell goods.  Helai told authorities she was annoyed by Samir's decision to make Maqdoor a shareholder; but it was what Samir wanted and Samir had always been a "father" figure to her.  (RFE 33).

The government says that Helai's statements are corroborated by statements Azizi gave to investigators:   "At my request, Helai worked at Wega Mobile as a 'maid of all work.'  She always did exactly what I told her to do."  (RFE 36).

Azizi's control over Wega Mobile is further corroborated, says the government, by

United States District Court
Northern District of California

statements Tunc made during interrogation and in statements given to authorities.  According to the RFE, Tunc said the following:

- Azizi took the initiative with respect to establishing Wega Mobile, and during a meeting with Tunc at Azizi's apartment in Dubai, Azizi proposed forming the company.  Azizi struck Tunc as an expert in the cell phone business, whereas Tunc said he himself had previously only dealt in cell phone accessories (through his own company, Wegatrade GmbH) and had no experience in the actual cell phone trade.  So, Tunc agreed to found Wega Mobile with Azizi.  Azizi wanted Tunc to be the managing director; he wanted his brother, Selaiman Azizi, to sell; he wanted Helai to work for the company in some capacity; he wanted Hosai to do the accounting; and Azizi himself wanted to do purchasing and sales.

- Azizi, through Helai, established business contacts with other companies in the VAT fraud carousel.  The first orders for Wega Mobile came from WOC, which shared an office with Wega Mobile.  Then later, Wega Mobile established contacts with companies, including Rapid Link, Thaysen Telekom, Nordica, AC Medienfonds, I.I. First Euro Trading, Apple Solution, Thayagram, Hamsterecke,[23] and Ferrograph.  Tunc claimed that, at that time, he was unaware of the fraud carousels and could not assess where the suppliers came from; and, he thought that Azizi had been behind all of the contacts.

- After a time, Tunc became concerned and did not like the way Wega Mobile's business was being conducted.  For example, he said a delivery from AC Medienfond, that had already been delivered, was to be processed with an invoice from I.I. First Euro Trading; and, Tunc says he received no answer to the question why the "supplier should be replaced in an untraceable way."  Additionally, goods were sold to Prizeflex in England, but the invoices were not paid.  When Tunc

---

[23] As discussed more fully below, the government alleges that Hamsterecke is another company controlled by Azizi and used in VAT fraud chains.

United States District Court
Northern District of California

asked about this, one Nishel of Prizeflex explained that Samir had ordered it. Further, Tunc said that Hamersterecke was presented as a new supplier, and he ordered goods there and drove himself to the forwarding company in Kelsterbach, but Hamsterecke's goods were not there.

- While in Turkey, Tunc says that Samir approached him with a person named "Adam," and there was a threatening exchange when Adam demanded payment on I.I. First Euro Trading's invoices, with Azizi adding that Tunc did not know who he was dealing with.

- Tunc claims that he confronted Azizi (to no avail) and also told Helai that he (Tunc) believed Samir was doing his own thing. Tunc says that Azizi also put severe pressure on his sisters. According to Tunc, he went, together with Hosai, to the solicitor office of Klein & Meves; however, Samir and his brother, Selaiman Azizi, had already been there. And, "[s]olicitor Meves had exerted strong influence upon him, as if he was strongly involved in the overall context. . . ."

(RFE 32-33, 37-39).

The government says that emails and chat protocols show that Azizi established business contacts, set prices, and released goods. In chats, the government says that Azizi is referred to as "boss." Moreover, the government says that conversations and business arrangements were made (1) either through the fixed-line numbers of Wega Mobile and Wegatrade GmbH or through Azizi's cell phone; and (2) through email addresses for WOC, Wega Mobile, and Wegatrade GmbH. (RFE 33).

According to the RFE, in a statement given to authorities, Azizi had this to say about how Wega Mobile was started:

> Then I got to know Mehmet Tunc. He had the Wegatrade. He bought goods from WOC. I then personally delivered the goods and got to know him at that occasion. I was enthusiastic about him. He was really competent. I wanted a partnership. Then we founded the Wega Mobile. I did not have the money for the share capital. He took over my part and advanced the money. But me and my

36

brothers and sisters could not become shareholders now, as we already had problems with the tax office.  I wanted to do clean business with Wega Mobile.  Therefore I asked my cousin Fariah, I was together with her, and as she trusted me, she agreed.  She did not know anything about my problems with the tax office.  I told that I was too young for such a thing and that only she could do this for me.  She felt honored by this evidence of confidence.  For this purpose she only had to affix some signatures at the German Consulate in the USA.  But it was clear to everybody that she was only my trustee.  I should do purchasing and sales and Tunc accounting and finances at Wega Mobile.  But it was difficult to find customers when doing clean business.  Therefore I started purchasing at my company WOC and at Venus Trading.  I even abstained from making profit with WOC, i.e., I waived a margin, only to get the company Wega Mobile running.

(RFE 34).  Further, Azizi stated that Wega Mobile also began to do business with the companies Rapid Link and Apple Solution, which acted as Wega Mobile's suppliers.  At that time, according to Azizi's statement, "there was a huge rush of English people on the market.  Although the companies were German, their managing directors were British.  The entire communication was only made in English."  (RFE 34).  Azizi stated that he "had doubts, whether they were all so clean," but "thought that it was not my problem, if the suppliers were crooked.  Only when the financial investigation police came to Wega Mobile I felt serious doubts."  (RFE 35).  Azizi goes on to state that he met Rapid Link's and Apple Solutions' representatives at a 2009 Cebit fair, where Azizi said that Wega Mobile "made already enormous turnover.  E.g. we purchased there directly from Rapid Link and then resold directly.  Everything via laptop.  Everything was already processed from there, payments included, everything without goods."  (RFE 35).

According to Azizi's statement to investigators, people from I.I. First Euro Trading and Point One were also at the Cebit fair; and, it was there that he also met Adam Hicks, whom Azizi told authorities was a resident of India.  Azizi goes on to describe Hicks as follows:  "But Hicks was certainly not his real name.  Certainly an alias name.  Whose Indian's [sic] real name is Hicks?  Hicks lives in India still today.  They are all very careful.  Nobody invites anybody to his home.  You only have a cell phone number, an e-mail address and a bogus name."  (RFE 35).[24]

---

[24] As discussed more fully below, the government alleges that Azizi also organized an emission allowance VAT fraud chain with Hicks, whom Azizi described in a statement to investigators as

United States District Court
Northern District of California

1    Further, according to the RFE, Azizi told authorities:   "Then, in May 2009, the raid was

2    conducted at the company Wega Mobile.  Afterwards we no longer purchased from WOC but

3    from the company Wegatrade.  But then the business of Wega Mobile plunged.  I then also

4    withdrew from there."  (RFE 36).  Azizi goes on to tell authorities, "As of May nothing worked

5    with me there and I left Germany.  I did not dare to come back, because I was afraid of an arrest

6    warrant."  (RFE 36).

7    Additionally, the government says that Azizi also provided investigators with statements

8    explaining how VAT fraud operated in the cell phone field: "Ways of the VAT fraud carousel

9    concerning cell phones:  Producer of the goods → EU company 1 → GER company 1 → GER

10    company 2 → GER company 3 → Thaysen Telekom → EU company 2 → GER company 4 →

11    GER company 5 → GER company 6 → Exporter."  (RFE 36).  According to the RFE, Azizi

12    detailed how goods moved through this chain, with "[t]he man pulling the strings ensur[ing] that

13    the monetary flows remained incomprehensible to 'third parties.'"  (RFE 36).  Additionally,

14    according to the RFE, Azizi told authorities that payments were made through platforms such as

15    Global Reach, Swefin, and Swebline and "[e]very company participating in the fraud received a

16    so-called Payment Batch Report for each payment from the corresponding platform or from the

17    bank, where the platform account was held."  (RFE 37).  Further, Azizi stated:  "All amounts

18    transferred in [U.S. dollars] were sharings out of the loot and the amounts transferred in [British

19    pounds] or [euros] were amounts that flow back into the fraud chain."  (RFE 37).

20    The government claims that this evidence indicates that Azizi ran Wega Mobile as de facto

21    managing director and integrated the company as a buffer in a VAT fraud carousel.  According to

22    the RFE, purchase invoices found at Wega Mobile show the following unwarranted refunds of

23    input tax based on bogus transactions with a number of fraudulent companies:

24        •   €76,811.00 for alleged purchases from Apple Solution GmbH, a company the

25            government says the Berlin Tax Investigation found to be a likely "missing trader"

26

27    _____

28    "one of the greatest in VAT fraud."  (RFE 54).

based on evidence that the company was not located at its listed address, its managing director was nowhere to be found; the company did not dispose of any premises, furniture, documents, or assets; and telephone numbers listed on its invoices were incorrect or non-existent.

- €556,508.00 for alleged purchases from AC Medienfonds GmbH, a company the government says the Munich Tax Investigation found to be a sham company with no registered office or managing director.

- €266,294.00 for alleged purchases from Rapid Link GmbH, a company the government says the Munich Tax Investigation found to be a sham company that never had a registered office and which lists an address belonging to a different business.

- €585,916.00 for alleged purchases from I.I. First Euro Trading GmbH, a company the government says the Frankfurt Tax Investigation found to be a "missing trader," with an address belonging only to an office-service business and no I.I. First Euro Trading office domiciled there.

- €526,707.00 for alleged purchases from Venus Trading GmbH, a company the government says the Düsseldorf Tax Investigation found to be a sham company knowingly integrated into the VAT fraud chain as a buffer.

- €36,773.00 for alleged purchases from Hellas Traders GmbH, a company the government says the Frankfurt Tax Investigation found to be a "missing trader" based on evidence that the company operates under two office service addresses; does not file tax returns; and was run by one Umesh Salvi, who reportedly also controlled other companies used for VAT fraud, including German companies DCS Diamond Communication Systems GmbH and Hellas Traders GmbH, as well as other companies domiciled abroad:  Zenith Ltd. USA and Zenith FZE Dubai.

- €131,105.00 for alleged purchases from Point One International Trading GmbH, a company the government says the Frankfurt Tax Investigation found to be a

United States District Court
Northern District of California

United States District Court
Northern District of California

"missing trader" based on evidence that its business address belongs to an office service company and the managing director has never lived in Germany.

- €10,510.00 for alleged purchases from Sercan Gül, Future Trading Aalen, a company the government says the Schwäbisch Gmünd Tax Investigation found to be a "missing trader" based on evidence that the company does not have its headquarters at the listed address.

- €5,069.00 for alleged purchases from AWAG GmbH/AWAG Alexander Wagenfeld, a company the government says the Düsseldorf Tax Investigation found to be a buffer company knowingly inserted into the VAT fraud chain. According to investigators, AWAG GmbH was terminated and the corporate shell subsequently was purchased and renamed AMCO-Group Germany GmbH, which itself was purchased and renamed Greenside Energies GmbH only four weeks later. One Matthis Hartig, says the government, was determined to be the person responsible; and, according to the RFE, Hartig was prosecuted by the Frankfurt Attorney General and sentenced to prison by the Frankfurt Regional Court.

- €195,912.00 for alleged purchases from WOC GmbH, a company the government says the Hagen Tax Investigation found to be a company inserted by Azizi into the VAT fraud chain based on evidence discussed above.

- €178,693.00 for alleged purchases from Ferrograph GmbH, a company the government says the Düsseldorf Tax Investigation found to be a sham company established for the purpose of VAT fraud based on evidence discussed above.

- €39,959.00 for alleged purchases from Hamsterecke.de GmbH, a company the government the Leipzig Tax Office and the Düsseldorf Tax Investigation found to have been purposely integrated into the VAT fraud chains by Azizi.

(RFE 40-45).[25]

---

[25] The total input tax from these invoices is higher than the government's claimed fiscal damages. According to the RFE, this is because Azizi did not actually submit all of these invoices to the tax

40

The evidence before the court is sufficient to establish probable cause to believe that Samir Azizi committed the alleged offenses charged in counts 11-20.

### 8.   Alleged offenses re iTrading GmbH & Co. KG (Counts 21-26)

The government alleges that, together with his cousins (Habib, Hamid, and Hamed Soori), Azizi operated several companies as de facto managing director and claimed unwarranted refunds of input VAT based on purchase invoices of alleged suppliers, knowing that the invoices were not based on actual deliveries or services.  With respect to iTrading GmbH (iTrading), Azizi is said to have integrated the company in VAT fraud chain.  He is charged with 6 counts of claiming unwarranted refunds of input VAT, for total claimed fiscal damages of €10,909,022.00.  The dates of the alleged offenses and the subject amounts are as follows:

- Count 21:  December 10, 2009, €117, 623.00
- Count 22:  January 4, 2010, €46,719.00
- Count 23:  January 18, 2010, €11,650.00
- Count 24:  February 10, 2010, €6,751,860.00
- Count 25:  April 13, 2010, €1,671,633.00
- Count 26:  June 17, 2010, €2,309,537.00

(RFE 62).

According to the government, iTrading was integrated into a VAT fraud chain as a buffer company involved in the sale of emission allowances ($CO_2$ permits) to a company known as Lösungen 360.  Lösungen 360 then allegedly re-sold the permits to Deutsche Bank in Frankfurt, which then transferred the certificates to Deutsche Bank in London in a fraud carousel that led back to Germany.  According to the RFE, the alleged fraud was uncovered as follows:

Based upon a VAT audit conducted by the Düsseldorf Center Tax Office, the government says that between October and November 2009, Azizi's cousin, Habib Ahmad Soori (at Azizi's direction), tried to establish iTrading in the emissions trading market and to obtain a tax

office.  (RFE 44-45).

United States District Court
Northern District of California

identification number.  According to the VAT auditors, the tax office declined to issue a tax identification number at that time because Soori did not demonstrate any particular knowledge of the emission allowance trade, did not have a clear business concept, and could not make any statements about financing.  Soori reportedly told finance officers that he planned to hire someone who could satisfy the business requirements and that he intended to begin trading in emissions allowances only when he found a suitable employee.  The government says that the VAT audit, however, revealed that iTrading was already conducting business in the emission allowances trade.  Specifically, authorities say that the company received an October 23, 2009 invoice from Sabs Euro Trading GmbH (Sabs Euro Trading) for iTrading's alleged purchase of 21,000 emission allowances for €332,117.10, as well as an October 23, 2009 invoice for the alleged purchase of 25,000 allowances for €404,005.00.  According to the RFE, Sabs Euro Trading is a company known for VAT fraud in the cell phone business.  The government says that the invoices were suspicious because the date of re-invoicing of both margins was earlier than the date service was provided.  (RFE 46-47).

According to the government, other invoices revealed further irregularities in iTrading's business activities.  iTrading reportedly issued invoices on October 15 and 16, 2009 to a company called Grünhaus Energie GmbH (Grünhaus Energie).  But, in a search of Grünhaus Energie's premises, authorities say those invoices were not found.  Moreover, the government says Grünhaus Energie's address was the same address of several other companies, including I.I. First Euro Trading (discussed above), Evatrading GmbH, and Vektor-Energie GmbH.  (RFE 47).  Other invoices, says the government, show that the invoice dates did not match the transaction dates recorded in the $CO_2$ Emissions Trading Registry; and, although the invoices indicated that the number of transferred $CO_2$ allowances matched traded volumes, the registry showed that the number of invoices issued was inconsistent with the number of transactions made.  (RFE 47-48).

The government says its investigation revealed that iTrading eventually obtained a tax identification number when Habib Soori presented Raik Heinzelmann as iTrading's employee. The government claims that Heinzelmann did not actually work for iTrading, but was instead in

United States District Court
Northern District of California

United States District Court
Northern District of California

charge of a different company, Advatag AG, which began collaborating with iTrading in April 2010.  Authorities say that iTrading then experienced a huge increase in sales revenues---a strong indication to German tax offices that iTrading was part of a VAT fraud chain.  (RFE 48).

Further indication of fraud, says the government, was iTrading's dealings with the company Lösungen 360, which was managed by one Irfan Patel.[26]  The government alleges that, in December 2009, Lösungen 360 began purchasing emission allowances from iTrading and, in turn, passed the allowances on to Deutsche Bank in Frankfurt.  According to the statement given by Heinzelmann, who was separately prosecuted, Patel was acquainted with the Soori family.  In addition to Habib Soori, Heinzelmann said he knew another brother in the Soori family named Hamed.  According to the RFE, Heinzelmann told authorities that Hamed supervised the businesses and money transactions; and, Heinzelmann identified Samir Azizi in photographs as "Hamed."  (RFE 48-49).

According to the RFE, in statements made to authorities, Habib, Hamid, and Hamed Soori, as well as Selaiman and Helai Azizi, all said that Samir Azizi often assumed the role of Habib or Hamed Soori when dealing with third parties.  (RFE 49).

Additionally, based on confiscated chat protocols and Heinzelmann's statement to investigators, the government says that both Samir Azizi and Habib Soori knew that Lösungen 360 subsequently delivered emission allowances to Deutsche Bank.  As discussed above, Germany says that it enacted a law requiring companies with huge greenhouse gas emissions to participate in the emission allowances trade.  The government claims that this is evidence of an artificial delivery chain implemented for no other purpose than VAT fraud---one with predetermined partners and which makes no business sense.  (RFE 49).

Another indicator of VAT fraud, says the government, is the speed with which emission allowances are traded through the delivery chain.  For example, in the course of their

---

[26] According to the extradition papers, on December 21, 2011, the Frankfurt Regional Court sentenced Patel to a prison term of 7 years and 10 months for gang-based tax evasion in connection with emissions trading of Lösungen 360.  (RFE 48).

investigation, authorities say they determined that one emission allowance was channeled 5 times in 11 minutes through different $CO_2$ Emissions Trading Registry accounts, whereas a single transaction ordinarily takes at least 2 minutes.  (RFE 49).  According to the RFE, the speed with which transactions occur might lead one to conclude that there is little time to consider how a profit can be made.  But, the government claims that profits are basically guaranteed by the VAT evasion and the pre-determined "purchasers," making it possible to sell allowances below the daily stock market price.  (RFE 49).  For this reason, the government says that missing traders often sell millions of allowances without any advance payment.  (Id.).

During his interrogation, the government says that Heinzelmann produced a data file of allowances that were moved through the chain.  According to the RFE, based on that file, authorities determined that the same allowances were traded up to 18 times through the chain and then "turned round" several times through Germany, England, Dubai, and other countries.  (RFE 50).  Moreover, the government says that payments were often processed through the same payment platform, and the subject companies allegedly kept a bank account into which all funds flowed, differentiated only by corresponding sub-accounts.  (RFE 50).

Through several searches of iTrading's business premises, authorities say they confiscated a large volume of documents, including data from computers, chat protocols, email accounts, cell phones, Blackberries, and other personal digital assistant devices.  Authorities also intercepted communications.  According to the government, evaluation of this data revealed the following:

- Azizi knew that Lösungen 360 did not have a real registered office and instead registered its office at an address belonging to an office service company.

- Azizi knew that Lösungen 360 delivered emission allowances directly to Deutsche Bank.

- In telephone calls, Azizi himself made arrangements with Deutsche Bank employees.

- Azizi secured contracts with business partners and controlled financial transactions and business activities, often dealing with third parties under false identities.

United States District Court
Northern District of California

44

1  (RFE 50-51).

2          Brorhilker avers that, in a statement given to authorities, Azizi said:

3     • In 2009 he was heavily in debt and, in March 2009, he heard about the emission
4        allowances trade and learned "that enormous amounts of taxes are evaded by
5        means of these emission allowances."  (RFE 52).

6     • In June 2009 he met with Adam Hicks---whom Azizi described as "one of the
7        greatest in VAT fraud"---in Dubai, where they discussed the organization of an
8        emission allowances fraud carousel:   "We met in the lobby of the Fairmont Hotel.
9        I should participate in the emission fraud.  I would not have a problem with this, as
10       I was not to be a missing trader in the matter.  I should simply try to approach
11       customers, e.g., Deutsche Bank.  I should only be the buffer."  (RFE 52, 54).

12    • He founded the companies iCell and iTrading:   "It was clear to me that emission
13       trade only functions because of the missing traders.  I then wanted to do emission
14       trade and also sell cell phones to end users, e.g., via eBay.  I was well aware of the
15       fact that in Germany a large part of the cell phones that are not directly bought
16       from distributors are afflicted with VAT fraud.  That's just the way things are in
17       Germany.  You don't see it when you look at the goods.  Then I founded the
18       companies iCell and iTrading."  (RFE 52).

19    • "I wanted to make something new again.  But this time something clean.  With my
20       family.  That's better than dealing with strangers.  You can have more confidence
21       in your family.  My cousin Habib Soori was unemployed at that time.  In
22       September 2009 I invited him to Dubai.  He should become the managing director
23       and owner of the new company in Germany.  But it was clear that in fact I am the
24       owner of the company and that I also give the money for it.  I did not want to do
25       anything under my name Azizi in Germany anymore."  (RFE 51).

26         Additionally, the government says that Azizi provided authorities with details about his

27  efforts to establish suppliers for the delivery chain, including Hamster-Ecke and Sabs Euro

28                                        45

Trading.  According to the RFE, Azizi told authorities that his brother Selaiman mentioned Hamster-Ecke, and Hicks suggested Sabs Euro Trading as a supplier.  (RFE 53).  When Azizi tried to obtain an emission trade register account, he says Hicks put him in contact with Grünhaus-Energie and thereafter, Azizi says "everything went automatically":

> Telephone calls were only dealing with payment processing. Everything should be on the mail account info@itrading.net.  The person responsible for Grünhaus was also the boss of the company Baudin Handels GmbH.  Grünhaus was searching for buffers. That's why we then started doing business.

(RFE 53).  According to the RFE, Azizi said that when purchases were made from suppliers, "First we paid the money to their normal account and then to Global Reach in London."[27]  (RFE 53).

The government says that, in that same statement to authorities, Azizi told them about iTrading's integration into the VAT fraud chain as follows:   He returned to Germany in December 2009 for the first time---landing first in Amsterdam "[a]s a precaution," and then driving into Germany to iCell/iTrading, where he named himself "Kevin."  (RFE 53).  Shortly after, Azizi met again with Hicks in Dubai and "spoke[] very frankly about VAT fraud."  (RFE 54).  The two discussed that "iTrading should really be integrated as a buffer" because the company was "nearly bankrupt," and Azizi told authorities, "I then joined in."  (RFE 54-55).

According to the RFE, in his statement to authorities, Azizi provided details about how emission allowances moved through the VAT carousel from Germany to England and then back to Germany and about how payments were made:

- "Paths of the emission allowances:   Missing trader Germany → buffer Germany -- Lösungen 360 --- Deutsche Bank Germany --- Deutsche Bank England (UK) – SVS Securities Ltd. England (UK – Gluke Ltd. England (UK) – missing trader Germany --- etc."  (RFE 56).

---

[27] As discussed above in connection with Wega Mobile, authorities say that Azizi identified Global Reach as a payment platform used in VAT fraud chains.  (RFE 37).

United States District Court
Northern District of California

United States District Court
Northern District of California

- "Paths of the money:   Global Reach --- SVS Securities ltd. England (UK) --- Deutsche Bank England (UK) --- Deutsche Bank Germany --- Lösungen 360 Germany --- Global Reach England (UK).  Via this rapid chain all the money was available on the next day again."  (RFE 56).

- "Those who were available as missing trader's [sic] in this group got a profit share of 0.1-0.3%.  The missing trader did not have an own [sic] bank account and the money never was transferred via him.  At the end of the month the profit share was established and somehow paid out.  Either on other accounts or in cash.  It was the same with the buffer.  Buffer 1 sold to buffer 2 (e.g., Lösungen 360) and they sold to Deutsche Bank.  The money of Deutschen [sic] Bank went to the account of Lösungen 360 with Deutsche Bank.  Lösungen 360 transfers to Global Reach England.  There the money is converted into £ and then it is transferred to SVS Security; they then rebuy the allowances from Deutsche Bank in London."  (RFE 55-56).

Additionally, in a statement given to investigators, Azizi explained how payments generally were made in a VAT fraud chain and pointed to iTrading as an example:

> Every company participating in the fraud received a so-called Payment Batch Report for each payment from the corresponding platform or from the bank, where the platform account was held. There it was apparent what happened with the money.  These Batch Reports were hidden and should still to be found on the computer of the company iTrading/iCell.  For example it could be seen, when the company iTrading paid €4,136,958.00 to the company Global Reach, that from this amount four times 500,000.00 [U.S. dollars], and once 600,000.00 [U.S. dollars] and an amount of 1,536,958.00 [British pounds] were transferred from the platform.  You could also see where the money was going.  Therefore the fraud must be quickly understood, as e.g., these 1,536,958.00 [British pounds] were paid to the company SVS Securities PLC, although this company was not a supplier of the companies iTrading or iCell.

(RFE 37).

According to the German government, on December 11, 2011, the Frankfurt Regional Court sentenced several perpetrators mentioned by Azizi to prison for VAT evasion in connection

47

with the emission allowances trade.  And, the Frankfurt Attorney General's Office is investigating the involved employees of Deutsche Bank.  (RFE 56).  Further, the government notes that, in Case No. 5 V 3555/10 A (H(U)), the Düsseldorf Finance Court concluded that the claimed deductions of input tax were unwarranted since the alleged suppliers in the delivery chain (i.e., I.I. First Euro Trading GmbH, Everstar Handels GmbH, and Sabs Euro Trading GmbH) had no real address. The government claims that this is in line with case law of the European Court of Justice and of the Federal Fiscal Court, holding that "a bogus establishment in a form that is characteristic of a so-called letter box entity or a dummy company is not assessed as being a registered office of a business activity."  (RFE 57).

Further, the government says that in a statement given to authorities, Habib Soori said that:

- Azizi called him to say he had an idea for a company and asked if Soori was interested.
- Azizi gave Soori €40,000 for the business.
- Azizi gave Soori a list of companies from whom Soori was to purchase and to whom he should sell, and Soori made purchases on Azizi's instruction.
- Azizi went by the name "Kevin Ahmadi" because he wanted to avoid problems from his past stemming from the name Azizi.  Azizi also answered the phone and presented himself as "Soori."  And, Azizi always denied that a "Samir" existed at the company.
- Azizi did everything with respect to outside contacts.  Whenever someone telephoned speaking English, Soori passed the call to Azizi; and Soori recalled that, on one occasion, five or six people (one of whom Azizi identified as an investor) were in the office late with Samir speaking in English.  Thereafter, Soori said that they began to make a lot of money.

(RFE 57-58).  According to the RFE, Soori told investigators that he initially believed the money legitimately was made from one of Azizi's businesses.  But later, on a flight to the United States, Soori said he asked Azizi about everything, and Azizi told him that they had gotten into a fraud

48

United States District Court
Northern District of California

1    chain.  (RFE 58).

2         The government says that Helai Azizi also gave a statement to authorities confirming that

3    Samir often pretended to be "Kevin Ahmadi," something she said she assumed he did because of

4    the name Azizi.  And, in connection with another business, AS Handels GmbH,[28] Helai said she

5    answered the phone identifying herself, not as Azizi, but as "Celina."  (RFE 58).

6         The government says that in a statement given to authorities, Hamed Soori said:

7         • Azizi asked him if he wanted to do something with securities; and Hamed said that

8              he should have paid more attention to the fact that Heinzelmann transferred money

9              to iTrading's account and not elsewhere.

10        • Azizi did the purchasing and had the password to the registry account.

11        • Azizi always pretended to be a "Soori" and also called himself "Kevin Ahmadi."

12   (RFE 58-59).

13        Based on this evidence, the government claims that Azizi, acting as de facto managing

14   director, operated iTrading as a buffer in a VAT fraud chain in the cell phone and emission

15   allowances trades, and claimed unwarranted refunds of input VAT based on purchase invoices

16   from alleged suppliers, even though he knew that the invoices were not for actual deliveries or

17   services.  The government says that invoices found at iTrading show the following amounts of

18   input tax based on bogus transactions with a number of fraudulent companies:

19        • €5,719,727.000 for alleged purchases from I.I. First Euro Trading GmbH, a

20             company the government says the Frankfurt Tax Investigation found to be, not a

21             real company, but a "missing trader" integrated into the VAT fraud chain (and, as

22             discussed above, also alleged to be a supplier to Wega Mobile in a VAT fraud

23             chain).

24        • €4,948,764.00 for alleged purchases from EverStar Handels GmbH, a company the

25

26   ──────────────

27   [28] As discussed more fully below, the government alleges that AS Handels GmbH is another
     company controlled by Azizi and used in VAT fraud chains.

28                                              49

United States District Court
Northern District of California

government says the Berlin Tax Investigation found to be a company that does not actually exist, based on evidence that no company (not even an office service company) exists at the listed address, and the company's managing director is nowhere to be found.

- €117,532.00 for alleged purchases from Sabs Euro Trading GmbH, a company the government says the Munich Tax Investigation found to be a "missing trader" with bogus registered addresses.

- €76,409.00 for alleged purchases from Amaan Enterprise GmbH or amaanenterprise GmbH, a company the government says the Düsseldorf Tax Investigation found to be a non-existent company founded solely for VAT fraud purposes.[29]

- €3,789,844.00 for alleged purchases from Hanna GmbH, a company the government says the Düsseldorf Tax Investigation found to be a "buffer" company in VAT fraud chain for emission allowances.  According to the RFE, registry accounts show that allowances were transferred from I.I. First Euro Trading and Everstar GmbH to Hanna GmbH to, which in turn, passed the allowances on to Lösungen 360 GmbH.  The government says that, at most, only a few minutes lapsed between these purchases and sales of the emission allowances, further indicating that the transactions did not serve any legitimate business purpose and were made for the purpose of VAT evasion.

- €130,406.00 for alleged purchases from Evatrading GmbH (formerly Techsplosion GmbH), a company the government says the Elmshorn Tax Investigation found to be a sham entity integrated in VAT fraud chains in the emission allowances trade, as well as in the fields for play stations, copper cathodes, and cell phone devices.

---

[29] As discussed more fully below, Amaan Enterprises GmbH/amaanenterprise GmbH is alleged to be another company controlled by Azizi and used in VAT fraud chains.

1    According to the RFE, Evatrading used fictitious addresses, where investigators

2    found no indication that any business actually was conducted there; no payment

3    transactions were controlled from there; no contacts were made to authorities; and

4    no business documents existed.

5    (RFE 59-62).[30]

6    The evidence before the court is sufficient to establish probable cause to believe that Samir

7    Azizi committed the alleged tax evasion/fraud offenses charged in counts 21-26.

8    **9.  Alleged offenses re iCell GmbH & Co. KG (Counts 27-41)**

9    iCell GmbH & Co. KG (iCell) is one of the group of companies that the government says

10    Azizi operated as de facto managing director, together with his Soori cousins.  Azizi is charged

11    with 15 counts of claiming unwarranted refunds of input VAT to German tax authorities in

12    connection with iCell, an alleged buffer company, resulting in fiscal loss of €12,573,141.00.[31]

13    The dates of the alleged offenses and the subject amounts are as follows:

14    • Count 27:  November 19, 2009, €424.00

15    • Count 28:  December 10, 2009, €58,382.00

16    • Count 29:  January 11, 2010, €224,646.00

17    • Count 30:  February 10, 2010, €1,649,034.00

18    • Count 31:  March 10, 2010, €2,558,089.00

19    • Count 32:  April 12, 2010, €2,243,921.00

20    • Count 33:  June 17, 2010, €927,728.00

21    • Count 34:  June 17, 2010, €2,309,537.00

22    • Count 35:  July 12, 2010, €182,010.00

[30] The total input tax from these invoices is higher than the government's claimed fiscal damages. According to the RFE, this is because Azizi did not actually submit all of these invoices to the tax office.

[31] The government says that, in some instances, the tax office ultimately did not approve payment on the submitted claims for a refund.  Nevertheless, the government says that those claims are considered attempted offenses.

United States District Court
Northern District of California

- Count 36:   August 10, 2010, €73,885.00

- Count 37:   September 9, 2010, €329,231.00

- Count 38:   October 11, 2010, €740,942.00

- Count 39:   November 10, 2010, €289,758.00

- Count 40:   December 10, 2010, €144,693.00

- Count 41:   January 10, 2011, €340,861.00

(RFE 67-68).  Based on confiscated documents, the authorities say they discovered an artificial supply chain, linking a fictitious intra-Community supply that went to missing traders controlled by Azizi, then to several buffers (also controlled by Azizi), then to a distributor that exported the bogus goods.  The government says that, among other things, the confiscated documents reveal the following invoice path (i.e., delivery chain) in which more than one company controlled by Azizi served as "buffers":

> Sabs Euro Trading GmbH and I.I. First Euro Trading GmbH (allegedly coordinated by Azizi together with Sajid Bagas and Inayat Patel)
> ↓
> Nexo Chakfa GmbH (allegedly controlled by Samir Azizi, along with Selaiman Azizi)
> ↓
> iCell GmbH & Co KG (allegedly controlled by Samir Azizi, along with Habib Soori)
> ↓
> Techstage (reportedly managed by Marcel Weidemann, an alleged acquaintance of Samir Azizi)
> ↓
> Thaysen Telekom GmbH & Co KG (an alleged distributor).[32]

(RFE 64-65).  There are a number of indicators, says the government, demonstrating that this is an artificial delivery chain controlled by Azizi:

First, the government says that Azizi's brother, Selaiman Azizi, as well as one Yusuf Güles (who has also been charged),[33] identified I.I. First Euro Trading and Sabs Euro Trading as missing

---

[32] As discussed above, Thaysen Telekom GmbH & Co KG is also an alleged participant in VAT fraud chains involving Ferrograph.

[33] Güles is discussed in more detail below in connection with Nexo Chakfa e.K./Nexo Chakfa GmbH, another company Azizi is alleged to have controlled and purposely integrated in a VAT

United States District Court
Northern District of California

traders with only letter box addresses.  (RFE 64).  (As discussed above, both of these companies are alleged to have been part of VAT fraud chains with other companies run by Azizi.)  Additionally, the government says that both Selaiman Azizi and Güles said that Samir Azizi often made payments to Sabs Euro Trading via a "financial platform" account in England with Global Reach Partners.  (Id.).  (As discussed above, Global Reach Partners is said to have been identified by Azizi in statements to authorities as a payment platform used in VAT fraud chains.  See RFE 55-56.)

Second, the government says there is evidence that Azizi controlled more than one company in the chain.  As discussed above, Azizi himself told authorities that he founded iCell (RFE 52); and, he also explained how payments generally were made in a VAT fraud chain, noting as an example, that money was paid to the company SVS Securities PLC, even though that company was not a supplier of iTrading or iCell.  (RFE 37).

Additionally, the government says that Selaiman Azizi and Güles both told authorities that Samir Azizi was responsible for founding and managing iCell, as well as Nexo Chakfa; that he was the idea contributor; that he made the decisions; that he purchased the goods; and that he determined in advance the products and quantities to be "sold" and who would have direct contact with Techstage.  (RFE 63-64).  Moreover, the government says that during a September 28, 2011 interrogation, iCell employee Ivan Dikic (who was separately prosecuted) said that Azizi "made the important and final decisions of the companies iCell and iTrading. . . .."  (RFE 63).  And, according to the RFE, Andreas Buschmann, another iCell employee, told authorities that Azizi "definitely was the real boss. . .."  (RFE 63).

Further indicating Azizi's control over this chain, says the government, are statements by Selaiman Azizi and Güles that Samir Azizi was the one who was responsible for founding and managing a company called AS Handels GmbH (formerly, AS Cellectric GmbH).  (RFE 64).  According to their statements, AS Handels GmbH initially invoiced iCell; and later, when

fraud chain.

United States District Court
Northern District of California

Techstage could no longer make "purchases" from iCell, Samir Azizi arranged to have iCell invoice AS Handels GmbH, which in turn, "sold" to Techstage.  (Id.).  In other words, the government claims that Azizi arranged to have AS Handels GmbH switch places with iCell as a buffer in the alleged VAT fraud chain.

Third, the government claims that Azizi operated under false names to hide his identity. According to the RFE, iCell employees Ivan Dikic and Andreas Buschmann identified Azizi in photos as "Kevin Ahmadi."  (RFE 63).  Additionally, the government says that Selaiman Azizi and Güles both stated that Samir Azizi presented himself as "Kevin Ahmadi" to third-parties on the phone and in conversations and also pretended to be a "Soori" (the  family name of his cousins Habib, Hamid, and Hamed Soori).  (Id.).  Moreover, the government says that both Selaiman Azizi and Güles stated that Samir Azizi tried to avoid being recognized as "Azizi" and also falsified signatures.  (Id.).

The government says that through iCell, Azizi also fraudulently obtained purchase invoices and claimed unwarranted refunds of input tax from the following "upstream" companies in the chain, knowing that the invoices were not based on any actual supplies or services. According to the RFE, invoices found at iCell show the following amounts of input tax based on bogus transactions with a number of fraudulent companies:

- €1,186,662.00 for alleged purchases from Hamsterecke.de GmbH, a company the government says the Leipzig Tax Office and the Düsseldorf Tax Investigation found to have been purposefully integrated into VAT fraud chains by Samir Azizi.[34]

- €5,552,089.00 for alleged purchases from Nexo Chakfa eingetragener Kaufmann (e.K.) and Nexo Chakfa GmbH, a company the government says was found by the Hagen Tax Investigation to have been purposefully integrated into VAT fraud

---

[34] As discussed more fully below, the government alleges that Hamsterecke.de GmbH is another company Azizi controlled and used in VAT fraud chains.

United States District Court
Northern District of California

1    chains.

2    • €3,765,857.00 for alleged purchases from AS Handels GmbH, a company the

3    government says the Düsseldorf Tax Investigation found to have been willfully

4    established for the purpose of committing VAT fraud and integrated into VAT

5    fraud chains.[35]

6    (RFE 65-67).  The government says that the claimed fiscal losses are also based on amounts found

7    on several smaller invoices, which Brorhilker says are also illegal because "neither the issuer of

8    the invoices nor the recipient of the invoices are undertakings in the meaning of the VAT Act."

9    (RFE 67).

10       The evidence before the court is sufficient to establish probable cause to believe that Samir

11   Azizi committed the alleged tax evasion/fraud charged in counts 27-41.

12       **10. Alleged offenses re AS Handels GmbH (Counts 42-45)**

13       The government alleges that AS Handels GmbH (AS Handels) was integrated as a buffer

14   in a VAT fraud chain, moving goods from Sabs Euro Trading GmbH to other companies

15   downstream.  Azizi is charged with one count of non-submission of VAT returns and three counts

16   of claiming unwarranted refunds of input tax (misrepresentation), resulting in fiscal damages of

17   €7,270,741.00.  The dates of the alleged offenses and the subject amounts are as follows:

18       • Count 42:  April 11, 2010 (non-submission), €3,335,383.00

19       • Count 43:  August 10, 2010 (misrepresentation), €2,026,001.00

20       • Count 44:  October 15, 2010 (misrepresentation), €1,499,792.00

21       • Count 45:  February 10, 2011 (misrepresentation), €409,565.00

22       The government says that AS Handels was a "shelf" company originally registered on

23   August 20, 2003 as AKMA Export Import GmbH, with its registered business being identified as

24   the production and sale of bags, shoes, carpets, textiles and other goods.  (RFE 68).  According to

25

26   _____

27   [35] As discussed more fully below, the government alleges that AS Handels GmbH is another
     company Azizi controlled and used in VAT fraud chains.

28                                          55

the RFE, Hamid Soori told authorities that Helai Azizi approached him and asked him to found a company; and that Samir Azizi later called him and suggested that Hamid take over a founded GmbH and that he (Azizi) would find one, but it had to be in Düsseldorf.  (Id.).

The government says that on January 19, 2010, AKMA Export Import GmbH was renamed AS Cellectric GmbH (AS Cellectric), and the managing director, Mohammad Rhabaran,[36] was replaced by Hamid Soori.  (RFE 68).  According to the RFE, Soori stated that Samir Azizi provided a list of customers that they were to buy from and sell to; and, at Azizi's direction, Sabs Euro Trading was AS Cellectric's supplier, and AS Cellectric, in turn, sold to iCell.  (RFE 69).  The government says Soori's assertions are supported by statements Samir Azizi gave to authorities:  "And then Hamid bought the company AS Cellectric GmbH (respectively AS Handels GmbH).  As I wanted them to be well supplied, the company iCell bought at AS Cellectric."  (Id.).

As discussed above, the government says that Sabs Euro Trading:

- was identified by Selaiman Azizi and Yusuf Güles as a "missing trader" with a letter box address (RFE 64);

- was, in a statement given to authorities, identified by Azizi as a "supplier" in the emission allowances VAT fraud chain he organized with Adam Hicks (RFE 53);

- was, in Case No. 5 V 3555/10 A (H(U)), found by the Düsseldorf Finance Court to be a company with no real address and that the claimed deductions of input tax based on invoices from Sabs Euro Trading (and other alleged suppliers) were unwarranted (RFE 57);

- was found by the Munich Tax Investigation to be a "missing trader" with no real address (RFE 60); and

- was, according to Selaiman Azizi and Güles, often paid by Samir Azizi via a

---

[36] According to the government, Rhabaran was one of the shareholders of the shelf company Ferrograph GmbH.  (RFE 26).

United States District Court
Northern District of California

"financial platform" account in England with Global Reach Partners, identified by

Samir Azizi as a payment platform that moved money through the emission

allowances VAT fraud chain.  (RFE 56, 64).

Additionally, as discussed above, the government claims that iCell was another company

controlled by Azizi and used in VAT fraud chains.  (RFE 63-68).

According to the RFE, on May 20, 2010, AS Cellectric was renamed AS Handels GmbH,

and the company's registered office was relocated to an address in in Düsseldorf.  (RFE 68).

Brorhilker says that in a statement given to authorities, Hamid Soori said that, within the first

month of business, they had a turnover of €3 million and that he did not initially find that odd

since they were selling to iCell.  But, Soori says that he had been naïve and did not think about the

possible consequences.  And, according to the government, Soori stated that he later became

suspicious because, even though the company was relatively new, clients came to them quickly

and turnover moved quickly.  (RFE 69).

Additionally, as discussed above, the government says that Selaiman Azizi and Güles both

stated that Samir Azizi was the one who was responsible for founding and managing AS Handels;

that he was the idea contributor; that he made the decisions; that he purchased the goods; and that

he determined in advance the products and quantities to be "sold."  (RFE 64).

Moreover, as discussed above, based on statements by Selaiman Azizi and Güles, the

government says that Azizi arranged to have AS Handels GmbH switch places with iCell as a

buffer in a VAT fraud chain, such that iCell sold to AS Handels, which in turn passed goods to

downstream companies.  (RFE 64).

The government claims that Samir Azizi operated AS Cellectric, now AS Handels, as the

company's de facto managing director; and, based on purchase invoices at AS Handels, the

government further alleges that Azizi wrongfully claimed refunds of input tax, knowing that the

invoices were not based on any actual supplies or services, as follows:

- €128,731.00 input tax for alleged purchases from iCell, a company the government

  says was found by the Düsseldorf Tax Investigation to have been created for the

57

1        purpose of committing VAT fraud and integrated into fraudulent delivery chains;

2       &bull;  €208,142.00 input tax for alleged purchases from Adisony GmbH, a company the

3        government says the Berlin Tax Investigation found to be a "buffer" in a

4        nationwide VAT fraud system; and

5       &bull;  €1,504,757.00 input tax for alleged purchases Amaan Enterprise GmbH, a

6        company the government says the Düsseldorf Tax Investigation found to be a non-

7        existent and created solely for the purpose of VAT fraud.[37]

8   (RFE 69-70).

9        The evidence before the court is sufficient to establish probable cause to believe that Samir

10  Azizi committed the alleged tax evasion/fraud charged in counts 42-45.

11      **11. Alleged offenses re Nexo Chakfa e.K./Nexo Chakfa GmbH (Counts 46-56)**

12       The government claims that Azizi ran the company Nexo Chakfa e.K./Nexo Chakfa GmbH

13  as de facto managing director, integrated the company as a "buffer" in a VAT fraud chain, made

14  unwarranted claims for refunds of input VAT (misrepresentation) based on invoices (knowing that

15  the invoices were not based on any actual supplies or services), and failed to submit VAT returns

16  for a total fiscal loss of €5,260,446.00.  The dates of the alleged offenses and the subject amounts

17  are as follows:

18      &bull;  Count 46:   March 1, 2010 (misrepresentation), €1,406,374.00

19      &bull;  Count 47:   April 12, 2010 (misrepresentation), €363,680.00

20      &bull;  Count 48:   May 10, 2010 (misrepresentation), €685,091.00

21      &bull;  Count 49:   September 10, 2010 (non-submission), €667,510.00

22      &bull;  Count 50:   September 8, 2010 (misrepresentation), €32,650.00

23      &bull;  Count 51:   September 8, 2010 (misrepresentation), €549,142.00[38]

---

[37] As discussed more fully below, the government alleges that Amaan Enterprise GmbH is another company controlled by Azizi and used in VAT fraud chains.

[38] The government says that the tax office ultimately did not approve payment on this submitted claim for a refund.  Nevertheless, the government says that the claim is considered an attempted offense.

United States District Court
Northern District of California

1     •  Count 52: October 11, 2010 (misrepresentation), €30,303.00

2     •  Count 53: November 8, 2010 (misrepresentation), €536,169.00

3     •  Count 54: December 2, 2010 (misrepresentation), €67,033.00

4     •  Count 55: December 10, 2010 (misrepresentation), €395,883.00

5     •  Count 56: January 10, 2011 (misrepresentation), €226,611.00

6 (RFE 77-78).

7    According to the RFE, Nexo Chakfa e.K./Nexo Chakfa GmbH (Nexo Chakfa) was

8 founded by Selaiman Azizi and Güles in the cell phone trade.  The government says that Nexo

9 Chakfa e.K. was registered on August 13, 2009.  Then, pursuant to a September 30, 2009 notarial

10 contract, the government says that Selaiman Azizi and Güles founded Firma Nexo Chakfa GmbH,

11 (with a registered office in Siegen) together with one Joel Kabongo Kalambay as an additional

12 shareholder.  The RFE goes on to state that Firma Nexo Chakfa GmbH was registered on October

13 15, 2009; and then, pursuant to an October 29, 2009 contract, Kalambay transferred his shares in

14 equal parts to Selaiman Azizi and Güles.  (RFE 71-72).

15    According to Brorhilker, a November 2009 VAT audit conducted by the Siegen Tax Office

16 established that Nexo Chakfa e.K. did not have a business office, but only rented a flat; the IMEI

17 numbers of the allegedly traded cell phones had not been registered; the phones had never

18 physically been at the company's alleged registered office in Siegen; and the company started with

19 very high turnover from the very first month of business.  (RFE 72).  According to the RFE, the

20 same was found to be true of Nexo Chakfa GmbH.  (Id.).

21    In a statement to authorities, Samir Azizi said he integrated Nexo Chakfa into a VAT fraud

22 chain in the cell phone trade because Selaiman and Güles urgently needed money and because he

23 "thought another buffer would be good in order to be as far as possible away from the missing

24 trader"; and, according to Brorhilker, Azizi suggested Sabs Euro Trading and I.I. First Euro

25 Trading as "suppliers" and iCell as a "purchaser":

26

27     The foundation of the company Nexo (Note:  Nexo Chakfa GmbH)
      was  not  my  idea.   Güles  and  my  brother  Selaiman  wanted  to  do

28

United States District Court
Northern District of California

United States District Court
Northern District of California

something on their own.  But when they then had problems and urgently needed money, my mother said that I should help. Selaiman then cried on mum's shoulder.  I thought another buffer would be good in order to be as far as possible away from the missing trader.  Therefore I installed the company Nexo and him into the chain.  But mostly I suggested suppliers.  So they earned money again and I was not bothered by my mother.  At that time Helai was unemployed, she also wanted to have something on her own.  Due to the old problems with the tax office she could not have it officially.  I think she then talked to my cousin Hamid Soori.  And then Hamid bought the company AS Cellectric (respectively AS Handels GmbH).  As I wanted them to be well supplied, the company iCell bought from AS Cellectric.  Then the company iCell did not earn as much anymore, but it remains in the family.  On the day of the search, on April 28, 2010, I happened to be abroad, really by chance.  When I then heard that there were raids everywhere in Germany, I did not care to come back to Germany anymore. Furthermore, they took away my brother Said's passport and I thought they will also take mine.  Afterwards they had to continue on their own to cover the cost.  I sometimes gave them tips and I helped them out, as far as I could do this on the run.

(RFE 74).

Based upon analysis of business documents, the government says that Nexo Chakfa was inserted in an artificial delivery chain between "missing traders" Sabs Euro Trading[39] and I.I. First Euro Trading, and that neither one of these "suppliers" made any actual deliveries.  According to the RFE, the München Tax Investigation found that Sabs Euro Trading did not have any actual business activities, and the Frankfurt Tax Investigation found the same to be true of I.I. First Euro Trading.  (RFE 72-73).

Additionally, the government says that statements given by iCell employees confirm that Nexo Chakfa was purposely integrated into a VAT fraud chain by Azizi.  According to the RFE, during his September 28, 2011 interrogation, iCell employee Andreas Buschmann said that Azizi (whom he knew as "Kevin Ahmadi") "said that [iCell] now ran via the company AS Handels GmbH and the company Nexo Chakfa GmbH to the company Techstage of the separately prosecuted Marcel Weidemann. . . .."  (RFE 74).  Additionally, the government says that during his September 28, 2011 interrogation, iCell employee Ivan Dikic said that AS Handels GmbH and

---

[39] Brohilker says that the Munich Local Court issued a warrant for the arrest of Sajid Bagas, the alleged managing director of Sabs Euro Trading.  (RFE 73).

1    Nexo Chakfa GmbH had purposely been integrated into the VAT fraud chain.  (RFE 75).

2         Invoices, according to the RFE, also show that Sabs Euro Trading and I.I. First Euro

3    Trading extended significant credit on a scale that would be inconceivable in the ordinary course

4    of business.  For example, the government says that between January 22, 2010 and February 28,

5    2010, Sabs Euro Trading issued invoices for around €2.7 million, but received payments of only

6    €130,000.00.  (RFE 73).  Similarly, the government says that invoices show that between January

7    7, 2010 and January 11, 2010, I.I. First Euro Trading made "deliveries" on credit amounting to

8    almost €1.3 million.  And, before those "deliveries" were paid for, additional invoices were issued

9    on January 13, 2010 for nearly €4 million.  (Id.).  By the end of March 2010, the government says

10   that I.I. First Euro Trading extended credits between €3 million and €5.6 million.  (Id.).

11   Moreover, the RFE says that business documents show that Nexo Chakfa extended credit to iCell.

12   (RFE 72).  And, when payments were made, funds were transferred to I.I. First Euro Trading and

13   Sabs Euro Trading or directly to a Global Reach Partner Ltd.[40] account with Lloyds TSB Bank in

14   London.  (RFE 72).

15        Moreover, the government says that the volume of alleged sales is vastly out of proportion

16   to the payments made.  According to the RFE, only three payments to suppliers were matched

17   with corresponding invoices; and, the volume of traded cell phones amounted to €456,662.00---

18   only 3.5% of the total payments made in the amount of €13,354,982.00.  Remaining payments,

19   says the government, do not correspond at all to any invoices.  (RFE 73).

20        Thus, based on invoices found at Nexo Chakfa, the government says that claimed refunds

21   of input tax for purchases purportedly made to the following companies were obtained by fraud:

22        •   €1,306,432.00 input tax for alleged purchases from Sabs Euro Trading, a company

23             the government says the München Tax Investigation found to be a "missing trader"

24             with bogus registered addresses (RFE 60, 75);

25   _____

26   [40] As discussed above in connection with iTrading, the government says that Global Reach
     Partners was identified by Samir Azizi as one of the companies that moved money through the

27   emission allowances VAT fraud chain organized with Adam Hicks.  (RFE 56).

28                                                    61

United States District Court
Northern District of California

- €2,076,855.00 input tax for alleged purchases from I.I. First Euro Trading, a company the government says the Frankfurt Tax Investigation found to be a "missing trader" with an address belonging only to an office-service business and no I.I. First Euro Trading office domiciled there (RFE 41, 75);

- €18,715.00 input tax for alleged purchases from Hamsterecke.de GmbH, a company the government says the Düsseldorf Tax Investigation found to have been purposefully integrated into VAT fraud chains by Azizi;[41]

- €108,082.00 input tax for alleged purchases from Microtech GmbH, a company the government says the Frankfurt Tax Investigation found to have been integrated as a "buffer" into VAT fraud chains;[42] and

- €828,537.00 input tax for alleged purchases from Amaan Enterprise GmbH or amaanenterprise GmbH, a company the government says the Düsseldorf Tax Investigation to be a non-existent company created solely for the purpose of VAT fraud.[43]

(RFE 75-77). The government says that the claimed fiscal losses are also based on other input tax amounts from various smaller invoices that were similarly obtained by fraud, "as neither the issuer of the invoices nor the recipient of the invoices are undertakings in the meaning of the VAT Act." (RFE 77).

The evidence before the court is sufficient to establish probable cause to believe that Samir Azizi committed the alleged offenses charged in counts 46-56.

---

[41] The government's allegations re Hamsterecke.de GmbH are discussed more fully below.

[42] According to Brorhilker, the persons responsible for managing Microtech GmbH have already been convicted. (RFE 76).

[43] The government's allegations re Amaan Enterprise GmbH/amaanenterprise GmbH are discussed more fully below.

### 12. Alleged offenses re Hamsterecke.de GmbH/Hamster Mobile GmbH (Counts 57-66)

The government alleges that, in connection with the company Hamsterecke.de GmbH, later renamed Hamster Mobile GmbH, Azizi failed to submit VAT returns and claimed unwarranted refunds of input tax, amounting to a fiscal loss of €6,302,224.00:

- Count 57:   November 9, 2009 (misrepresentation), €221,794.00

- Count 58:   November 11, 2009 (misrepresentation), €133,871.00

- Count 59:   January 19, 2010 (misrepresentation), €160,412.00

- Count 60:   January 19, 2010 (misrepresentation), €234.958.00

- Count 61:   March 10, 2010 (misrepresentation), €132,973.00

- Count 62:   May 26, 2010 (misrepresentation), €289,084.00

- Count 63:   May 26, 2010 (misrepresentation), €51,558.00

- Count 64:   September 11, 2010 (non-submission), €715,455.00

- Count 65:   October 11, 2010 (non-submission), €3,575,311.00

- Count 66:   November 11, 2010 (non-submission), €786,808.00

(RFE 80-81).[44]

Brorhilker says that the official managing directors of Hamsterecke.de GmbH, later renamed Hamster Mobile GmbH on January 8, 2010, (hereafter referred to as "Hamster") were Fred Wenzek and Shiraz Jilani, both of whom were prosecuted.  (RFE 78).  According to the RFE, on July 7, 2010, Hamster's registered office was transferred to Leipzig and Jilani was replaced as managing director by one Richard Mintus, who himself was later replaced by one Andreas Feiherr von Rössing (also being prosecuted) on December 20, 2010.  (Id.).

The government claims that although not the official managing director, Azizi is the one who actually controlled the company.  According to Brorhilker, confiscated emails and chat protocols show that Azizi established customer contacts, set prices, made payment transactions,

---

[44] The government says that, in some instances, the tax office ultimately did not approve payment on the submitted claims for a refund.  Nevertheless, the government says that those claims are considered attempted offenses.

63

and presented himself as the company's managing director to third-parties.  (RFE 78).

Additionally, the government says that the chat protocols contain conversations between Selaiman

and Helai Azizi, in which they say that Samir Azizi controlled the company.  Further, Brorhilker

says that Selaiman Azizi later stated during a hearing that he believed Samir Azizi was pulling the

strings behind Hamster, which had been integrated into a VAT fraud chain.  (RFE 78-79).

The government says that documents also show that Sabs Euro Trading and I.I. First Euro

Trading were "suppliers" in the chain.  (RFE 79).  As discussed elsewhere in this order and in the

RFE, the government says that these companies were found by tax authorities to be "missing

traders," who also participated in other artificial delivery chains run by Azizi.

Additionally, Brorhilker says that documents demonstrate that Azizi drafted Hamster

invoices from various other companies in the chain.  For example, from at least October 2009, the

government says that the design of Hamster invoices match those of Sabs Euro Trading, and

purchase invoices and sales invoices both contain the same printing irregularities.  According to

the RFE, while the letterhead and the sub-line of both companies' invoices are in normal typeface,

the remaining print re product design and price are both blurred, suggesting that these entries are

added later from another printer and that the same printer is used to make those subsequent entries.

(RFE 79).  Additionally, the government says that blank Hamster invoices were found at the

premises of other companies in the supply chain.  For example, authorities say they found blank

Hamster invoices stored on computers and laptops confiscated from iCell.  As discussed elsewhere

in this order and in the RFE, Azizi told authorities that iCell is a company he founded (RFE 52),

and the government alleges that iCell is another company that served as a "buffer" in VAT fraud

chains controlled by Azizi (RFE 63-68).

Further evidence of fraud, says the government, are discrepancies on invoices with respect

to Hamster's name change.  According to the RFE:  Authorities say they discovered two invoices,

both dated December 9, 2009 and bearing the same invoice number (2009100033)---but, one

invoice was from Hamsterecke.de GmbH for €132,934.00 and the other was from Hamster Mobile

GmbH for a different amount.  (RFE 79).  Additionally, authorities say they found a Hamster-

Ecke.de GmbH invoice for cell phones dated September 15, 2009 in the amount €211,255.00, addressed to iCell at the Soori family's private address.  According to the government, iCell was never located at that address and was not founded and registered until October 6, 2009.  (RFE 79-80).  And, another invoice, says the government, displays Hamsterecke.de GmbH's logo, but bears the name of Hamster Mobile GmbH.  (RFE 80).

According to Brorhilker, analysis of Hamsterecke.de GmbH's accounting also reveals that goods were resold at prices that were below cost.  (RFE 80).

As such, and based on invoices found at Hamster, the government says that claimed refunds of €1,082,349.00 input tax for purchases allegedly made from Sabs Euro Trading were obtained by fraud.  As discussed above, the government says that Sabs Euro Trading was found by the Munich Tax Investigation to be a "missing trader" with bogus registered addresses (RFE 60, 75, 80).

The government says that the claimed fiscal losses are also based on input tax amounts found on smaller invoices from other traders and which are also illegal "as neither the issuer of the invoices nor the recipient of the invoices are operators in the meaning of the VAT Act."  (RFE 80).  According to the RFE, the claimed fiscal losses are also based upon VAT returns that Azizi allegedly was obliged, but failed, to submit.  (RFE 80-81).

The evidence before the court is sufficient to establish probable cause to believe that Samir Azizi committed the alleged offenses charged in counts 57-66.

**13. Alleged offenses re Amaan Enterprise GmbH/Mobiltronics GmbH (Counts 67-82)**

The government alleges that Azizi, acting as de facto managing director of Amaan Enterprise GmbH (later renamed Mobiltronics GmbH), wrongfully claimed refunds of input tax based on purchase invoices from alleged suppliers, knowing that the invoices were not based on any actual supplies or services, for a total fiscal loss of €10,308,708.00.  The dates of the alleged offenses and the subject amounts are as follows:

- Count 67:  November 9, 2010, €650,784.00
- Count 68:  November 9, 2010, €351,770.00

- Count 69:   November 9, 2010, €907,796.00

- Count 70:   November 9, 2010, €519,057.00

- Count 71:   November 9, 2010, €1,331,801.00

- Count 72:   November 9, 2010, €1,652,648.00

- Count 73:   December 9, 2010, €843,167.00

- Count 74:   January 27, 2011, €784,990.00

- Count 75:   February 7, 2011, €984,639.00

- Count 76:   March 10, 2011, €488,177.00

- Count 77:   March 10, 2011, €450,570.00

- Count 78:   April 11, 2011, €149,558.00

- Count 79:   May 10, 2011, €69,848.00

- Count 80:   June 9, 2011, €378,376.00

- Count 81:   July 8, 2011, €585,296.00

- Count 82:   August 10, 2011, €160,231.00

(RFE 86-87).[45]

According to the RFE, the corporate history of the subject company is as follows:  Amaan Euro Trading GmbH was founded by Inayat Patel on April 23, 2010, with solicitor Ramminger as the official managing director.  Less than two months later, on June 4, 2010,[46] the company name was changed to Amaan Enterprise GmbH, and the company's office was relocated to Ramminger's address in Frankfurt.  On October 1, 2010, the company relocated its office to another location in Frankfurt.  On November 30, 2010, one Nasir Afzal Ahmad was appointed managing director.  And, on March 28, 2011, when Amaan Enterprise GmbH (Amaan Enterprise)

---

[45] The government says that, in some instances, the tax office ultimately did not approve payment on the submitted claims for a refund.  Nevertheless, the government says that those claims are considered attempted offenses.

[46] The RFE states that the company name was changed on June 4, 2009; but, given the context of the discussion about the company's history, this court believes that the reference to 2009 may be a typographical error.

1  was registered in the commercial register, the company name was changed to Mobiltronics GmbH

2  (Mobiltronics).  (RFE 82).

3       The government says that there are several red flags about the company that strongly

4  suggest fraud:

5        •   The government believes that the company's original name, Amaan Euro Trading

6             GmbH, was quickly changed within 2 months because it was too similar to the

7             names of other companies in the alleged artificial delivery chain, namely Sabs Euro

8             Trading and I.I. First Euro Trading---two companies that, as discussed elsewhere in

9             this order and as alleged through the RFE, were found by tax authorities to be

10             "missing traders" engaged in VAT fraud.  (RFE 82).  Additionally, the government

11             says that, like Sabs Euro Trading and I.I. First Euro Trading, Amaan Enterprise

12             existed for a long time without a real registered office.  (Id.).

13        •   The government says that the managing director of I.I. First Euro Trading, Imran

14             Patel, is related to Amaan Enterprise's founder, Inayat Patel.  (RFE 82).

15        •   According to the RFE, business documents contain some glaring discrepancies.

16             For example, Amaan Enterprise's invoices are stamped with a VAT identification

17             number "VAT DE 815131036," and authorities say it is unusual for a German

18             company with a German value added tax identification number (Umsatzsteuer-

19             Identifikationsnummer) to use the English abbreviation "VAT," rather than the

20             German abbreviation "USt."  This, says the government, indicates that the fraud

21             was controlled from England.  (RFE 82-83).  Additionally, according to the RFE,

22             the company used different spellings of its name in letterhead, sometimes shown as

23             "Amaan Enterprise GmbH" (the correct spelling) and sometimes shown as

24             "amaanenterprise GmbH" (the incorrect one).  (RFE 83).

25       According to Brorhilker, emails and chat protocols show that Azizi is the one who

26  established customer contacts, set prices, controlled payment transactions, and presented himself

27  to third-parties as the company's managing director.  (RFE 83).

28

United States District Court
Northern District of California

1      Additionally, the government says that Azizi operated under fake names, including "Patel"

2  or "Patelino."  Based on statements from Selaiman Azizi and from former company employees,

3  the government says that the company's official managing directors, Inayat Patel and Nasir Afzal,

4  speak only English.  During telephone surveillance, however, the person called "Patelino" speaks

5  impeccable German.  According to the RFE, an expert in voice comparison from the Federal

6  Criminal Police Office confirmed that "Patelino"'s voice was that of Samir Azizi.  (RFE 83).

7      Moreover, the government says that Azizi is further linked to the company through a

8  friendship with Nasir Afzal, who was separately prosecuted.  The RFE includes a photo,

9  reportedly taken during a holiday in Dubai in 2009, showing persons the government identifies as

10  Samir Azizi and Nasir Afzal, together with others identified as Samir Azizi's brother (Said Azizi)

11  and Azizi's cousins (Hamid and Habib Soori).  (RFE 83-84).

12      As such, the government contends that Azizi, acting as de facto managing director,

13  wrongfully claimed refunds of input tax based on alleged "purchases" of cell phones and emission

14  allowances from Sabs Euro Trading, Adisony GmbH, and Fashion Textil GmbH.[47]  According to

15  the RFE, purchase invoices found at the company show input tax in the following amounts:[48]

16      &bull;  €3,284,187.00 input tax for alleged purchases from Sabs Euro Trading, as

17            previously discussed, a company the government says was found by the Munich

18            Tax Investigation to be a "missing trader" with bogus registered addresses (RFE

19            60, 75, 80, 85).

20      &bull;  €4,582,109.00 input tax for alleged purchases from Adisony GmbH, a company the

21            government says was found by the Berlin Tax Investigation to be a "buffer"

22            integrated into a nationwide VAT fraud system (RFE 85);

23      &bull;  €2,872,769.00 input tax for alleged purchases from Fashion Textil GmbH, a

24

25  [47] As discussed above, according to the RFE, Amaan Enterprises also "sold" emission allowances
to iTrading in a VAT fraud chain.  (RFE 60-61).

26  [48] The total input tax resulting from the identified invoices is higher than the government's

27  claimed fiscal damages.  According to the RFE, this is because Azizi did not submit all of these
invoices to the tax office.  (RFE 87).

28

1           company the government says was found by the Offenback Tax Office to have a

2           fictitious address and no actual economic activity and which was integrated as a

3           "missing trader" into VAT fraud chains (85-86).

4       The evidence before the court is sufficient to establish probable cause to believe that Samir

5 Azizi committed the alleged offenses charged in counts 67-82.

6       **14. Alleged offenses re BAK Enterprise GmbH (Counts 83-85)**

7       According to the RFE:   BAK Enterprise UG was founded on April 6, 2009 in Hanau,

8 Germany by one Ajitpal Sekhon, a Canadian citizen, who also was appointed as the company's

9 managing director.  The company's registered business purpose was identified as trading and

10 distributing water purification and filtration systems and refuse bin disposal systems, as well as

11 environmental consulting services.  Pursuant to a March 15, 2010 notarial contract, the

12 government says that the company was renamed BAK Enterprise GmbH (BAK Enterprise) and its

13 registered office was relocated to an address in Darmstadt belonging to the Merz, Arnold, Wipper

14 law firm, but these changes were not entered in the company's register.  (RFE 87).

15       Based on its investigation, the government claims that "Ajitpal Sekhon" actually was an

16 identity assumed by Azizi in connection with BAK Enterprise; and, because the company did not

17 file tax returns (as alleged by the government), the government claims that BAK Enterprise likely

18 operated as a "missing trader" in intra-Community transactions.

19       The government says it linked Azizi with BAK Enterprise through statements he gave to

20 authorities and based on a Canadian identity card for "Ajitpal Sekhon" (obtained during searches)

21 bearing Azizi's photograph.  (RFE 88).  Based on its investigation thus far, the government says it

22 has ascertained that the real Ajitpal Sekhon is a Canadian citizen who does not speak German and

23 who was sentenced in 2005 to ten years imprisonment for drug offenses.  (RFE 88).  According to

24 the RFE, a new trial will be held in the Canadian criminal proceedings and the judgment is not yet

25 final; but, under the circumstances, the government says it is highly unlikely that Sekhon would

26

27

28

69

have been permitted to travel to Germany in the meantime.[49]  (RFE 88).

According to the RFE, Azizi's connection to BAK Enterprise is also based on the fact that the company was founded by the law firm Wilke Consulting in Hanau, Germany.  (RFE 88).  The government says that many fraudulent companies integrated into VAT fraud chains were also founded in Hanau, including Amaan Enterprise---a company that, as discussed elsewhere in this order and the RFE, the government also attributes to Azizi and claims was integrated into VAT fraud chains.  (Id.).  Additionally, authorities say that the name "Martin Wilke Consulting" was found in Habib Soori's cell phone.  (Id.).  As discussed above, Habib Soori is alleged to be the official managing director of iCell and iTrading---two companies that, as discussed elsewhere in this order and in the RFE, the government also attributes to Azizi and claims were integrated into VAT fraud chains.  (Id.).

A further indicator of fraud, according to the government, is that BAK Enterprise, contrary to its registered business purposes, first operated in the emission allowances trade and then, later, in the cell phone trade.  (RFE 88).

As such, the government says that Azizi, acting as BAK Enterprise's de facto managing director, issued invoices for the supply of cell phones, emission allowances, and copper cathodes, but failed to declare the purported "sales" to the tax office for a total fiscal loss of €3,565,554.00. The dates of the alleged offenses and the amounts in question are as follows:

- Count 83:  October 11, 2011, €29,866.00
- Count 84:  January 11, 2012, €2,162,830.00
- Count 85:  April 11, 2012, €1,372,858.00

(RFE 89).

The evidence before the court is sufficient to establish probable cause to believe that Samir Azizi committed the alleged offenses charged in counts 83-85.

---

[49] Germany says it has submitted to Canada a request for mutual legal assistance to clarify that matter.  (RFE 88).

United States District Court
Northern District of California

**15. Alleged offenses re My iCell GmbH (Counts 86-89)**

The government claims that Azizi, acting as de facto managing director of My iCell GmbH (My iCell), wrongfully claimed refunds of input tax based on purchase invoices from alleged suppliers, knowing that the invoices were not based on any actual supplies or services, for a total fiscal loss of €520,589.00.  The dates of the alleged offenses and the subject amounts are as follows:

- Count 86:  June 15, 2011, €38,340.00
- Count 87:  July 5, 2011, €231,948.00
- Count 88:  July 22, 2011, €228,598.00
- Count 89:  September 6, 2011, €21,703.00

(RFE 92).

According to the RFE, My iCell GmbH (My iCell) was registered in the commercial register of the Neuss Local Court on April 6, 2011 and dealt in the trade and distribution of telecommunication devices, play stations, and consumer electronics, as well as the import and export of petroleum products, recyclable materials, and fruits and vegetables.  The company's official managing director was Marian Iancu (RFE 89-90).

The government says that various indicators show that it was Azizi who actually controlled My iCell's business and that the company was integrated into a VAT fraud chain:

- According to the RFE, emails and chat protocols show that Azizi established My iCell's customer contacts, set prices, and made payment transactions, and presented himself to third-parties as the company's managing director.  (RFE 90).

- The government says that My iCell experienced huge turnover immediately after it was founded---a typical sign of VAT fraud, according to the RFE.  (RFE 90).

- According to the RFE, My iCell had fixed trading partners, with payments received primarily from AVW Wernicke & Sahm GmbH and with payments being made primarily to Adisony GmbH.  (RFE 90).  As discussed elsewhere in this order and in the RFE, Adisony GmbH is a company the government says was controlled by

United States District Court
Northern District of California

United States District Court
Northern District of California

Azizi and found by the Berlin Tax Investigation to be a "buffer" integrated into a nationwide VAT fraud system.  (RFE 70, 92).  Additionally, according to the RFE, payments made to Adisony GmbH's accounts were directly transferred to a finance platform, "Omnis Capital FX Ltd.," in England.  (RFE 90).  The government believes that this is the successor platform to "Global Reach Partner und Corporates FX Ltd.," a platform in England that perpetrators, including iCell, originally used.  (Id.).  Further, the government says that My iCell was also paid from the Onmis Capital FX Ltd. platform.  (Id.).

- According to the RFE, My iCell paid a secretary's salary to Chafika Zariouh, who previously worked as a secretary at iCell.  During her interrogation, the government says that Zariouh confirmed that My iCell replaced iCell.  (RFE 91).  The government further claims that My iCell took iCell's place in VAT fraud chains based on (1) purchase invoices showing that Adisony GmbH and Amaan Enterprise both "supplied" My iCell; and (2) Adisony GmbH and Amaan Enterprise previously "supplied" iCell and AS Handels, two companies which allegedly were also controlled by Azizi.  (RFE 91).

- My iCell's registered address, says the government, was changed on February 21, 2011 to Iancu's residence.  According to the RFE, Iancu is also associated with other companies involved in VAT fraud chains, including Peace Handels GmbH and Green Deutschland GmbH.  (RFE 91).

As such, the government claims that Azizi was My iCell's de facto managing director and since at least April 2011, he integrated the company as a "buffer" in a VAT fraud chain in iCell's place.  The government further claims that Azizi wrongfully claimed refunds of input tax based on purchase invoices from "suppliers," knowing that the invoices were not based on any actual supplies or services.  According to the RFE, purchase invoices found at My iCell show the following amounts of input tax based on purported purchases from the following companies:

- €23,926.00 in input tax for alleged purchases from Amaan Enterprise, a company

United States District Court
Northern District of California

1    the government says was controlled by Azizi and found by the Düsseldorf Tax

2    Investigation to be a non-existent company created solely for the purpose of VAT

3    fraud (RFE 91; see also RFE 82-87);

4    • €196,663.00 in input tax for alleged purchases from Adisony GmbH, a company

5    the government says was controlled by Azizi and found by the Berlin Tax

6    Investigation to be a "buffer" in a nationwide VAT fraud system.  (RFE 92).

7    The evidence before the court is sufficient to establish probable cause to believe that Samir

8    Azizi committed the alleged offenses charged in counts 86-89.

9    ## CONCLUSION

10    The evidence before the court is sufficient to establish probable cause to believe that Azizi

11    committed the 89 counts of tax evasion---i.e., 77 counts of providing tax authorities with

12    incomplete or incorrect statements about tax-relevant facts and 12 counts of failing to inform them

13    about tax-relevant facts, acting contrary to duty---in violation of Section 370, subsection no. 1 and

14    no. 2, subsection 3 sentence 2 no. 1 and no. 5 of the Fiscal Code of Germany in connection with

15    Sections 18 of the Turnover Tax Act of Germany, 22, 23, 25 subsection 2, 53 of the Penal Code of

16    Germany, and Sections 1, 105 ff of the Juvenile Justice Act of Germany.

17    For the reasons stated above, the request for a certificate of extraditability of Samir Azizi is

18    GRANTED.

19    Dated:   March 20, 2015

20    _____

21    HOWARD R. LLOYD
     UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28                                            73

5:14-xr-90282-PSG-1 Notice has been electronically mailed to:

Douglas L. Rappaport       admin@sfcrimlaw.com

John Mark Potter       johnpotter@quinnemanuel.com, amberburns@quinnemanuel.com,
calendar@quinnemanuel.com

John Norman Glang      John.Glang@usdoj.gov, Tracey.Andersen@usdoj.gov

Meagan Kara Bellshaw       meaganbellshaw@quinnemanuel.com, calendar@quinnemanuel.com,
mercedeshereford@quinnemanuel.com

Victoria K Blohm       vickiblohm@quinnemanuel.com

74